166 P.3d 916

**STATE of Arizona ex rel. Terry GODDARD, Appellee,**

v.

**WESTERN UNION FINANCIAL SERVICES INC., dba Western Union, Appellant.**

No. 1 CA–CV 06–0700.

Court of Appeals of Arizona, Division 1, Department A.

Sept. 11, 2007.

Terry Goddard, Attorney General By Cameron H. Holmes, Assistant Attorney General, Phoenix, Attorneys for Appellee.

Steptoe & Johnson LLP By Karl M. Tilleman, Francis J. Burke, Jr., Steven D. Wheeless, Charles G. Cole, Stacey F. Gottlieb, Phoenix, Attorneys for Appellant.

## OPINION

SNOW, Judge.

¶ 1 Western Union Financial Services, Inc. appeals the superior court's order enforcing compliance with the Attorney General's statutory request for information to Western Union made pursuant to Arizona Revised Statutes ("A.R.S.") sections 13–2315 (2001) and 6–1242 (2007). In the request, the Attorney General directed Western Union to produce data reflecting any wire-transfers made in an amount of $300 or more to any location in Sonora, Mexico from any Western Union location worldwide for a three-year period.

¶ 2 Although the Attorney General has demonstrated reasonable grounds to believe that a discrete portion of the data he seeks may have a connection to Arizona racketeering activity or may reflect wire-transfer transactions subject to Arizona reporting requirements, enforcement of the request would require Western Union to produce data of wire-transfers to locations to which the Attorney General has made no reasonable showing of a connection to Arizona. Because the burden is on the Attorney General to establish such a connection prior to the enforcement of his request, we vacate the enforcement order as being overbroad and remand it to the superior court to determine

what part, if any, of the request is enforceable pursuant to the standards set forth in this opinion.

## FACTUAL AND PROCEDURAL HISTORY

¶ 3 On April 21, 2006, the Arizona Attorney General requested Western Union pursuant to A.R.S. § 13–2315(A) to provide "[d]ata ... [r]elating to each send and each receive transaction of $300 and greater, received in the state of Sonora, Mexico, on a weekly basis as each week becomes available, beginning with January 1, 2004 and ending with December 31, 2006." The request required Western Union to provide forty-nine separate data fields of information as to each of these transactions. Pursuant to the requirements of the statute, the request was issued with "a sworn statement ... that the request is made ... to investigate racketeering" as defined by Arizona law. A.R.S. § 13–2315(A).

¶ 4 When Western Union challenged the request, the Attorney General indicated that the request was also made pursuant to A.R.S. § 6–1242, a statute from the chapter regulating money transmitters that authorizes certain investigations.

¶ 5 The parties to this appeal agreed to file a joint application with the superior court to resolve the question of the enforceability of the request. As the principal support for the reasonableness of its request, the Attorney General provided the affidavit of Daniel Kelly, a financial crimes investigator with the Arizona Department of Public Safety who is assigned to the Financial Crimes Task Force. The Financial Crimes Task Force is a cooperative endeavor comprised of different state and federal agencies dedicated to interrupting "the flow of drug and alien smuggling proceeds." The Arizona Attorney General's Office "serves as the financial analysis component of the task force.... As such, it makes use [o]f its statutory authorizations to obtain financial transaction information and its analytical resources to make that information useful to officers of the task force."

¶ 6 In support of its position, Western Union filed the Declaration of Stacy C. Anderson, its Manager of Subpoena Operations. Kelly replied to the Anderson Declaration in a supplemental affidavit. Because the substance of the affidavits of Kelly and Anderson bears directly on our resolution of this issue, we review them in some detail.

¶ 7 In his initial affidavit, Kelly acknowledges that there are many legitimate uses for wire-transfers to Sonora, including fund transfers from Mexican nationals in the United States to their families in Mexico. He further acknowledges that the subject of his affidavit (although not necessarily of the information request) is "a small but significant portion of the customers" of Western Union, i.e., those "engaged in violations of Arizona's anti-money laundering, racketeering and banking statutes."

¶ 8 Kelly testifies that smugglers (referred to as "coyotes") of undocumented immigrants ("UDIs") are typically paid for their racketeering activity after they have successfully transported their human cargo into Arizona. The coyotes are paid by "sponsors" who typically reside in states, referred to as "corridor states," to which UDIs are frequently transported when they leave Arizona. In the early years of this decade, the coyote, upon successful transport of the UDI to Arizona, would contact the UDI's sponsor and request that the sponsor wire funds to the coyote in Arizona before the UDI was placed in transit to his destination from Arizona.

¶ 9 Despite the use of various strategies by the coyotes' pick-up agents to avoid detection when collecting wire-transfer payments, law-enforcement officers were able to identify and locate Western Union agents frequently used by traffickers due primarily to the high volume of business that began to occur with those agents. Once identified in this manner, further analysis permitted the identification of patterns associated with wire-transfer activity associated with racketeering and the identification of pick-up agents.

¶ 10 Kelly asserts that due to law enforcement's success at identifying and seizing wire-transfer transactions sent to Arizona, traffickers drastically reduced the number of wire-transfer payments into the state. Instead, illegal traffickers began directing that the payments for their activities be sent to

pick-up agents in Sonora rather than Arizona. Kelly backs up these assertions by presenting his analysis of data voluntarily provided by Western Union that shows all of the wire-transfers to Sonora for the months of March and April 2005. Based on his analysis, Kelly determined that a disproportionate number of the financial transfers being sent to Sonora were sent to Western Union agents located in five cities along the Arizona border. These cities include Caborca, Altar, Nogales, Agua Prieta, and San Luis Rio Colorado. "All of these cities are well known to law enforcement as staging areas for smugglers, particularly human smugglers."

¶ 11 According to Kelly's analysis, during the sample period a total of $28,133,000 was transferred to all 201 Western Union agents in Sonora. Of that amount, almost $19,000,000, or two-thirds of the total, was sent to the eighteen agents located in these five border cities. A further analysis of the data demonstrated that the amounts sent to these five cities were predominantly sent from corridor states. Kelly states that he "and fellow investigators have already proven, based on the results of the past seizure warrant operations conducted by the task force, that this extremely out of balance flow of wires originating from the 'corridor' states consists largely of funds sent to smuggle people from Mexico into Arizona and thence to the corridor states."

¶ 12 Kelly's analysis of the data also shows that, in these cities, particular and specific receiver names "were found to be receiving hundreds of wires at a few agent locations." Additional analysis of these transactions showed both that the senders of the wires to these locations "were ... sponsors of smuggled aliens ... or were ... drug organization members" and that "dozens of pick-up operators active in receiving alien smuggling wires in the Phoenix metro area during 2004 and 2005 also received some of the ... wires received ... during March and April 2005." The affiant further avows that the increase of wire-transfers received by these recipients in the northern Sonoran cities coincided with a decrease in the same recipients' receipt of wire-transfers within Arizona.

¶ 13 Further, a "number" of actual senders and receivers of wire-transfers seized pursuant to a March 2006 seizure warrant "told investigators that alien smugglers in Arizona had instructed the wire senders not to send the wires to Arizona but instead to send the funds to receivers in cities in northern Sonora." Finally, Kelly states that investigators have also interviewed "numerous" "actual participants" in trafficking operations. Those interviews confirmed that smuggling organizations were directing that wire-transfers should be re-directed to northern Sonora "to avoid law enforcement interdiction" in Arizona.

¶ 14 In the Declaration submitted by Western Union, Anderson testifies that the Attorney General's request requires all records of wire-transfers into all of Sonora from any location in the world. Such a broad request for information, on its face, demonstrates no connection with Arizona and the information sought. The subpoena makes no effort to limit its scope to particular receiving agents or persons, location of origin of the wire-transfer, or indicia of illegality. Further, the subpoena requires forty-nine data fields of information as to each transfer.

¶ 15 Anderson detailed Western Union's willing compliance with other subpoenas issued by the Attorney General and Western Union's willingness to provide the requested information concerning Sonoran transactions in two tiers. The first tier disclosure would provide some data concerning all transactions into Sonora with some of the sender's personal identifying detail removed. Then, upon the State's request, Western Union would provide the identifying details as to those transactions the Attorney General identified in which he had additional interest. Anderson asserted that this double-tiered disclosure would better protect the confidentiality of Western Union clients in whose information the Attorney General had no interest and bore no relation to Arizona.

¶ 16 Anderson further identifies the top ten states from which funds are sent to Sonora via Western Union (California, Arizona, New York, Florida, Georgia, Illinois, New Jersey, North Carolina, Virginia and Texas), and further provides statistics for the two-

month period preceding Anderson's affidavit for transfers into Arizona and into Sonora. During that period, there were 13,459 transactions of $500 or more into Sonora. Anderson further avowed that the number of transactions sent to Sonora was decreasing.

¶ 17 In response, Kelly filed a supplemental affidavit. He testified that the conclusions contained in his initial affidavit were only strengthened by the financial information disclosed in Anderson's declaration. He testified that the top ten states from which Sonora had received wire-transfers in the 2006 information disclosed in Anderson's declaration were the same ten corridor states, in slightly different rank order, that had been the top ten senders of wire-transfers to the northern Sonoran cities in 2005. He avers that Anderson's new figures actually demonstrate a twenty-five percent increase in wire-transfers to Sonora.

¶ 18 Kelly also conducted further analysis to determine the locations in Sonora to which these corridor states were sending their wire-transfers. As a result of this analysis, he identified seven additional Mexican locations near the Arizona border that received large payments from corridor states. "The first tier of secondary hub cities includes Agua Prieta, Altar, Caborca, Nogales and San Luis Rio Colorado. The second tier of such cities that display a high volume and concentration of alien smuggling wires and are located in the same geographic region includes Cananea, Magdalena, Naco, Sahuaripa, Sasabe, Sonoita and Santa Ana. All of these cities are located in an area within 70 miles of the border between Arizona and Mexico and span that border from west to east."

¶ 19 Kelly then conducted an analysis to determine that the overwhelming volume of the wire-transfers from the corridor states are being disproportionately sent to these northern "smuggling centers of Sonora" as opposed to the more populous Sonoran cities such as Hermosillo which are located in the interior of the state.

¶ 20 After oral argument, the superior court ordered Western Union to comply with the subpoena, and Western Union filed its initial appeal with this court. Although Western Union's appeal deprived the superior court of jurisdiction, this court, at the request of the Attorney General, subsequently revested jurisdiction in the superior court so that the court could consider his motion to clarify and expand its original September 6 order.[1] After consideration, the superior court modified its September 6 order. Western Union timely appeals from that order. We have jurisdiction pursuant to A.R.S. § 12–2101(B) (2003).

## ANALYSIS

¶ 21 Western Union asserts both statutory and constitutional challenges to the enforcement of the administrative request. Because we determine that the present scope of the investigation is not authorized by Arizona law, we do not reach Western Union's constitutional arguments. *See Petolicchio v. Santa Cruz County Fair and Rodeo Ass'n Inc.*, 177 Ariz. 256, 259, 866 P.2d 1342, 1345 (App.1994) (holding that "Arizona's courts do not reach constitutional issues if proper construction of a statute makes it unnecessary in determining the merits of the action.").

### A. A.R.S. § 13–2315

¶ 22 Pursuant to A.R.S. § 13–2315(A), a financial institution is obliged to produce records to the Attorney General when the request is accompanied by a sworn statement that the request is made "in order to investigate racketeering as defined by § 13–2301, subsection (D), paragraph 4, or a violation of § 13–2312."

---

1. In conjunction with his motion for reconsideration, the Attorney General also submitted to the trial court additional affidavits. Western Union objected to their submission at which point the Attorney General confirmed that he was not submitting the additional affidavits to be considered as evidence and was not asking the trial court to consider them. The Attorney General nevertheless included and cited in his brief to these affidavits as well as two additional affidavits that were created after the entry of the final order in this matter. In our review we consider only the materials considered by the superior court. *Crook v. Anderson*, 115 Ariz. 402, 403–04, 565 P.2d 908, 909–10 (App.1977); *Roberts v. Spear*, 173 Ariz. 565, 567, 845 P.2d 491, 493 (App. 1992); *Gorney v. Meaney*, 214 Ariz. 226 n. 5, 150 P.3d 799, 805 n. 5 (App.2007).

¶ 23 The Attorney General acknowledges that "[t]o qualify as 'racketeering,' and thereby meet that element of A.R.S. § 13–2315, [which permits investigation of racketeering,] conduct must be 'chargeable or indictable' in Arizona and described in § 13–2301(D)(4)." Thus, at a minimum, the Attorney General must have a reasonable basis for believing that the wire-transfers from non-Arizona locations to destinations in Sonora have a connection with Arizona before the Attorney General can investigate such wire-transfers. A.R.S. § 13–108(A) (2001).[2] *See also State v. Willoughby*, 181 Ariz. 530, 541, 892 P.2d 1319, 1330 (1995).

¶ 24 Subsection (B) of A.R.S. § 13–2315 specifies that, if the financial institution refuses to comply, the Attorney General "may petition the superior court for enforcement." Subsection (B) requires the court to enforce the request "if the request is reasonable and [if] the attorney general ... has reasonable grounds to believe the records sought to be inspected are relevant to a civil or criminal investigation of an offense included in the definition of racketeering in § 13–2301, subsection (D), paragraph 4 or a violation of § 13–2312."

### 1. A.R.S. § 13–2315 Does Not Limit the Subpoena Power to the Investigation of Specific Criminal Incidents.

■ ¶ 25 Western Union argues that subsection (B) of the statute requires that the Attorney General be investigating a particular criminal incident prior to seeking judicial enforcement of a request because the statute requires "reasonable grounds to believe the records sought ... to be inspected are relevant to [the] investigation *of an offense.*" However, this proposed interpreta-

tion results from a truncated reading of the statute. The complete sentence specifies that the Attorney General must have reasonable grounds to believe that the "records sought ... are relevant to [the] investigation of an offense included in the definition of racketeering in [specified Arizona statutes.]" In this context, we believe it plain that the word "offense" refers to the criminal offenses included in the definition of racketeering and not uniquely to a specific and identified criminal act in which a defendant or specific criminal transaction has already been identified. "[T]he best and most reliable index of a statute's meaning is its language and, when the language is clear and unequivocal, it is determinative of the statute's construction." *Deer Valley Unified Sch. Dist. No. 97 v. Houser*, 214 Ariz. 293, 296, ¶ 8, 152 P.3d 490, 493 (2007) (quoting *Janson ex rel. Janson v. Christensen*, 167 Ariz. 470, 471, 808 P.2d 1222, 1223 (1991)).

■ ¶ 26 Subsection (A) of the statute confirms that this is the intended meaning. Pursuant to subsection (A), the financial institution must produce the requested records if it receives a sworn statement from the Attorney General that he needs the records "in order to investigate racketeering." That the Attorney General must be investigating racketeering does not require that the Attorney General identify one or more specific acts of racketeering to justify the investigation. Similar language is used in subsection (B) to specify that the information sought must be reasonably necessary to an investigation of a criminal racketeering offense as identified in Arizona statutes. "Statutory provisions are to be read in the context of the overall statutory scheme." *Prudential v. Estate of Rojo–Pacheco*, 192 Ariz. 139, 148, 962

---

**2.** A.R.S. § 13–108(A) specifies:

This state has jurisdiction over an offense that a person commits by his own conduct or the conduct of another for which such person is legally accountable if:
1. Conduct constituting any element of the offense or a result of such conduct occurs within this state; or
2. The conduct outside this state constitutes an attempt or conspiracy to commit an offense within this state and an act in furtherance of the attempt or conspiracy occurs within this state; or

3. The conduct within this state constitutes an attempt, solicitation, conspiracy or facilitation to commit or establishes criminal accountability for the commission of an offense in another jurisdiction that is also an offense under the law of this state; or
4. The offense consists of an omission to perform a duty imposed by the law of this state regardless of the location of the defendant at the time of the offense; or
5. The offense is a violation of a statute of this state that prohibits conduct outside the state.

P.2d 213, 222 (App.1997) (quoting *Goulder v. Arizona Dept. of Transp., Motor Vehicle Div.*, 177 Ariz. 414, 416, 868 P.2d 997, 999 (App.1993)).

¶ 27 To interpret the statute as Western Union suggests would interject a needless inconsistency in the two sections of the statute that the plain wording of the statute neither supports nor requires. Thus, we hold that, in appropriate cases, the Attorney General may use his authority granted by § 13–2315 to investigate not only particular crimes but also classes and types of crime so long as they are crimes that constitute racketeering as defined in the statute.

¶ 28 Western Union further argues that, in *People ex rel. Babbitt v. Herndon*, 119 Ariz. 454, 455–56, 581 P.2d 688, 689–90 (1978), the Arizona Supreme Court sets forth similar limits on the use of statutory investigative power. We agree. While the *Herndon* case establishes that the Attorney General is bound by the limits placed by the Legislature on the power to investigate, it does not support the proposition that, in all cases, the Attorney General must investigate only specific and identified criminal incidents.

¶ 29 In *Herndon* the Attorney General had requested books and records from a retailer to determine whether the retainer had engaged in a violation of the Consumer Fraud Act. To make such requests, however, the Act required the Attorney General to have reasonable cause to believe that the subject being investigated "has engaged in, or is engaging in, or is about to engage in" a violation of the Act. *Id.* at 455, 581 P.2d at 689.

¶ 30 Herndon refused to comply with the Attorney General's request for information, and sought discovery to ascertain on what basis the Attorney General believed he violated the Act. In rejecting Herndon's right to discovery in this context, the supreme court nevertheless observed that Herndon was able to contest the validity of the request for information on various grounds. One such

ground was specified by the statute itself. As the *Herndon* court noted, "the requirement that the Attorney General have reasonable cause to believe there has been a violation of the Act is an additional substantive limitation on his power to engage in pre=complaint discovery, inserted by the Legislature to prevent the abuses or excesses which might result from unlimited powers of investigation." *Id.* at 456, 581 P.2d at 690.

¶ 31 Thus, it was the Attorney General's obligation to establish to the court's satisfaction a reasonable basis for believing that Herndon either violated or would violate the Act prior to obtaining enforcement of the Attorney General's request. "The only effective method of protecting an investigated party against these possible abuses is to require the Attorney General, if challenged on that ground, to make some showing at the enforcement hearing that there is reasonable cause to believe that there has been a violation of the act." *Id.*

¶ 32 In this case there is no requirement in A.R.S. § 13–2315, as there was in the Consumer Fraud Act, that the Attorney General identify a specific target and crime for his investigation. Nor is the Attorney General engaging in the type of inquiry that was broadly condemned in *Herndon*.[3] Rather, the information contained in the two Kelly affidavits establishes a sufficient basis for the Attorney General to reasonably believe that there is a pattern of racketeering activity involving Arizona that results in illegal proceeds. In attempting to track the flow of those proceeds the Attorney General is not engaging in speculation "that some crime may be discovered." *Id.*

¶ 33 Nevertheless, before enforcing a request pursuant to § 13–2315, the statute does require that a court determine both that the request for information be "reasonable" and that the Attorney General have reasonable grounds to believe that the information sought is relevant to an investigation of a

---

**3.** "Investigations … for purely speculative purposes are odious and oppressive and should not be tolerated by law. Before they may be instituted, there must be knowledge or information that a crime has been committed. There is no power

to institute or prosecute an inquiry on chance or speculation that some crime may be discovered." *Id.* (quoting *Wales v. Tax Comm'n*, 100 Ariz. 181, 183–84, 412 P.2d 472, 474 (1966)).

crime defined as racketeering under Arizona law.

### 2. A.R.S. § 13–2315 Only Authorizes Reasonable Investigations.

■ ¶ 34 Western Union argues that the request did not comply with the requirement that it be objectively "reasonable." "What is reasonable depends upon the context" of the investigation. *United States v. R. Enterprises*, 498 U.S. 292, 299, 111 S.Ct. 722, 112 L.Ed.2d 795 (1991). Courts permit challenges to administrative investigations on the grounds that the information sought "is not within the agency's scope of authority, that the order is too vague, that it seeks irrelevant information and that the summons is being used for an improper purpose." *Herndon*, 119 Ariz. at 456, 581 P.2d at 690.

¶ 35 Western Union argues that the Attorney General has no right to investigate wire transactions that occur entirely outside this state because the Attorney General cannot establish a reasonable connection between such transactions and this state. This argument is overstated. Kelly's affidavits establish that there is a likely connection between racketeering activity in Arizona and at least some of the wire-transfers sent to northern Sonora from out-of-state locations. They establish that both sponsors and coyotes have indicated to law-enforcement officials that they are wire-transferring amounts from corridor states to northern Sonora for human-smuggling that occurs through Arizona. The Kelly affidavits also establish that, for at least certain recent periods, the disproportionate majority of funds wired into Sonora were wired to locations in five cities bordering Arizona that are known by "law enforcement as staging areas for smugglers." Large numbers of transactions were sent to the same individual in northern Sonora, and some of the individuals receiving wire-transfers in these cities are the same individuals who received similar wire-transfers in Arizona for likely racketeering activity. The funds wired to these cities came disproportionately from corridor states as opposed to more central and populous Sonoran cities such as Hermosillo.

■ ¶ 36 The decision whether reasonable cause exists "does not involve extensive weighing or testing of evidence or any resolution of conflicts in the evidence." Nor is it "whether the state's information is true or uncontradicted, but whether, assuming its accuracy, the state has in its possession sufficient information *to satisfy a judge* that it has been reasonable to believe that the [requirements of the statute have been met]." *Id.* at 458, 581 P.2d at 692 (emphasis added). That level of proof need not establish probable cause, but must constitute a sufficient preliminary showing upon which a reasonable person could conclude that the statute's limits on the investigative authority granted have been met. Thus, at least as to some of the wire-transfers into the designated northern Sonoran cities from corridor states, the Attorney General has established both the necessary relevance and jurisdiction to justify the subpoena.

■ ¶ 37 The Attorney General's demand for information, however, was not limited to such wire-transfers. The Attorney General seeks to require Western Union to disclose financial data from all wire-transfers to any location in Sonora for a period of three years. The reasonableness of a subpoena is not only a function of the type of information sought but also the scope of the information requested. In assessing the extent to which the reasonableness standard limits the permissible scope of an administrative request, the Supreme Court has determined that such requests may not be "excessive[ ] for the purposes of the relevant inquiry". *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 208, 66 S.Ct. 494, 90 L.Ed. 614 (1946) (quoting *In Re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir.2000)). While the Fourth Amendment provides no expectation of privacy in information that a customer gives Western Union to accomplish a wire transfer,[4] "the Fourth (Amendment), if appli-

---

4. All of the documents obtained [pursuant to a subpoena], including financial statements and deposit slips, contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business.... The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government....

cable (to subpoenas for the production of business records and papers), ... guards against abuse ... by way of too much ... breadth." *Miller,* 425 U.S at 445, 96 S.Ct. 1619 (quoting *Oklahoma Press,* 327 U.S. at 208, 66 S.Ct. 494).

¶ 38 Subpoenas that are overbroad are not enforceable. Thus, even a request that meets the other requirements of the statute "will not be enforced if it is too ... broad." *Peters v. United States,* 853 F.2d 692, 699 (9th Cir.1988); *see Hale v. Henkel,* 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906) ("[S]ome necessity should be shown ... to justify an order for the production of such a mass of papers.") overruled in part on other grounds by *Murphy v. Waterfront Comm'n of New York Harbor,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964); *EEOC v. Children's Hosp. Medical Center,* 719 F.2d 1426, 1428 (9th Cir.1983) (reasoning that subpoena is unreasonable and hence unenforceable if it is too broad); *NLRB v. Int'l Medication Sys., Ltd.,* 640 F.2d 1110, 1114 (9th Cir.1981) (reasoning that a court will enforce an agency subpoena if it is not needlessly broad); *General Ins. Co. of America v. EEOC,* 491 F.2d 133, 136 (9th Cir.1974).

¶ 39 The Attorney General cites no case, and we have found none, in which an administrative request similar in scope to the one at issue has been upheld as reasonable. In a case similar to this one, *In Re Grand Jury Proceedings: Subpoenas Duces Tecum,* a grand jury subpoenaed records of wire-transfers in amounts more than $1000 sent over a two-year period from a single Western Union location in Kansas City, Missouri. 827 F.2d 301 (8th Cir.1987). After rejecting Western Union's argument that its customers had an expectation of privacy in the information they had provided Western Union to accomplish the transaction, the Eighth Circuit addressed whether the scope of subpoenas, that would obviously include data for hundreds of innocent users, was too broad.

¶ 40 While generally holding that neither the Fourth Amendment nor the Federal Communications Act provided an expectation of privacy for innocent people whose transactional data was caught in the subpoena's "dragnet," the court explicitly noted that there were nevertheless privacy protections for such information. It invited the district court on remand to consider limiting the scope of the subpoenas under Federal Rule of Criminal Procedure 17(c) to more precisely target the data that would reveal criminal activity. Although conceding that investigative subpoenas for documents were allowed to be somewhat overbroad because generally a grand jury would not know exactly "[the] character or [the] contents" of the information for which it was looking, the court noted that such an argument held less sway when the government was requesting wire-transfer information. Generally, in such cases, the government frequently does know "the character and contents of the information it seeks." *Id.* at 305. Thus, it concluded that, on remand

> [t]he district court may therefore wish to consider the extent to which the government would be able to identify in advance those patterns or characteristics that would raise suspicion. These might include wire-transfers to or from individual suspects, transfers to certain locales known to be sources of high volumes of illegal drugs, or other particular patterns designed to focus on illegal activity without taking in an unnecessary amount of irrelevant material.

*Id.* at 305–06.

¶ 41 Unlike the authority pursuant to which the subpoenas were issued in *Grand Jury Proceedings,* A.R.S. § 13–2315 explicitly requires that the request for information be "reasonable" before it can be enforced. It further requires a reasonable connection between the information sought and the investi-

---

This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and

the confidence placed in the third party will not be betrayed.

*United States v. Miller,* 425 U.S. 435, 442–43, 445, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) (citations omitted).

gation into criminal racketeering activity in Arizona.

¶ 42 The concerns about the scope of the subpoena expressed by the Eighth Circuit in *Grand Jury Proceedings* arose in the context of a subpoena for transactions in which a single Western Union agency engaged. Here, the request applies to the receipt of designated transfers to every Western Union agency within the state of Sonora, apparently 201 locations, from any Western Union agent anywhere in the world. It seeks information regarding any receipts of amounts of $300 or more as opposed to the $1000 requested in *Grand Jury Proceedings*, and requests three years of information as opposed to the two that were there requested. *Id.* at 301. Thus, the sweep of this administrative request is much broader than the one about which the Eight Circuit expressed its concerns in *Grand Jury Proceedings. Id.*

¶ 43 Here, while the Attorney General does establish the likelihood that Western Union agents in the designated northern Sonoran cities are receiving wire-transfers related to racketeering activity in Arizona, he concedes that the information in the affidavits only established a connection between Arizona racketeering activity and the wire-transfers received in northern Sonora. The Attorney General asserted at oral argument that a connection between Arizona racketeering activity and other locations in Sonora would have to be inferred, but offered no factual basis on which to make such an inference. The Kelly affidavits establish the strong likelihood of the connection between wire-transfers to northern Sonoran cities and Arizona racketeering activity in part by contrasting the disproportionately high quantity and amount of wire receipts in northern Sonora to the rest of Sonora. The Kelly affidavits also establish that the northern Sonoran cities received their payments from a disproportionately high percentage of corridor states as compared with the rest of Sonora. Thus, in establishing that the Western Union

agents in northern Sonora are recipients of wire-transfers that can likely be connected to racketeering activity in Arizona by comparison with other Sonoran locations, the Attorney General has demonstrated that these other locations in Sonora do not share similar indicia demonstrating a connection between the wire-transfers and Arizona racketeering activity.[5] The Kelly affidavits do not establish that the remaining locations in Sonora demonstrate any indicia that would suggest such a connection.

¶ 44 In a footnote in his response and at oral argument, the Attorney General argued that the financial analysis he performs requires the creation of "control groups" for establishing baselines, comparing data from one area to another, and measuring changes over time. He asserts that he does not need to show any connection to racketeering in Arizona to obtain such data because data from areas not having significant indicia of the targeted criminal activity, presumably such as Hermosillo, is useful to compare with data from known smuggling staging areas such as the northern Sonoran cities. In this sense, the Attorney General argues, the data is relevant to the investigation of racketeering activity even if it is not itself indicative of crime and the request is thus authorized by the statute.

¶ 45 Even assuming we were to accept the proposition that data can be relevant to an *investigation* into crime even though the Attorney General does not allege that it demonstrates criminal activity, the statute nevertheless requires not just a reasonable belief that the information be relevant to an investigation of Arizona racketeering, it also requires that the information sought be reasonable. The Attorney General's argument amounts to the assertion that, under the statute, it is reasonable to compel the production of identifying data of thousands of persons who have no connection with Arizona merely to create a control group of proximate innocent activity to which he could com-

5. For example, if, as Kelly avows, the eighteen Western Union agents in five Northern Sonoran cities received approximately sixty-seven percent of all of the money transferred into Sonora by wire for the sample period, the remaining 183 Western Union locations elsewhere in Sonora received only thirty-three percent of the total money wire-transferred to Sonora. This lack of significant payments to the balance of the Western Union agents in Sonora does not reasonably support the conclusion that they are significant recipients of the proceeds of racketeering.

pare the results of suspicious data to determine trends or upon which he might make "broad strategic conclusions such as the aggregate size of the coyote industry." Such an argument, at best, would require the support of compelling circumstances, and even then it would raise due-process concerns of constitutional dimension. *See, e.g., Gerling Global Reinsurance Corp. of America v. Gallagher,* 267 F.3d 1228, 1235 (11th Cir. 2001) ("There must be at least some minimal contact between a State and the regulated subject before" the State "can, consistently with the requirements of due process," subject commercial activity to its regulation).

¶ 46 We appreciate that law-enforcement agencies may want to "keep ahead" of the traffickers who, in the relatively mobile and global world of money transfer, may have the ability to quickly adjust where and how they transfer racketeering proceeds. But, the argument the Attorney General makes here would make the investigative power granted in A.R.S. § 13–2315 limitless. It would provide a justification for requesting financial data from anywhere in the world merely because it might serve to provide a baseline of "innocent data" against which other suspicious activity might be evaluated.

¶ 47 The parties cite no Arizona law requiring Western Union to open all of its financial records to law-enforcement officials from any of its locations worldwide for the privilege of doing business in Arizona. To hold that the Attorney General could achieve the same result through a statutory request merely to establish such baselines would be tantamount to such a blanket requirement. We are reluctant to interpret so broadly the limited investigative authority granted the Attorney General by A.R.S. § 13–2315.

¶ 48 Further, both Kelly's initial and supplemental affidavit reveal that he was able to perform relevant comparisons between the Sonoran border cities and other Sonoran locations based on the data he received from Western Union. In light of this, it is unclear why the Attorney General would need additional control groups to isolate the areas in which wire-transfers of criminal proceeds from Arizona racketeering activity are likely being received. Nor does the Attorney General suggest why the two-tiered disclosure to which Western Union voluntarily agreed in the Anderson affidavit was insufficient to create such control groups if they were necessary.[6] Further, assuming the creation of additional control groups is necessary, and the two-tiered disclosure was insufficient to accomplish it, the Attorney General does not offer justification why three years of data from approximately 180 locations that show no indication of a connection to Arizona racketeering was reasonably necessary to create such control groups.

¶ 49 The Financial Crimes Task Force, which is a cooperative exercise of many jurisdictions including the federal government, has apparently decided to gather its financial data through Arizona law. It is thus limited in those efforts by the requirements of that law. Section 13–2315 requires that the request be both reasonable in light of the circumstances and reasonably related to the investigation of the crime of racketeering in Arizona.

¶ 50 As the court in *Herndon* held, and the text of A.R.S. § 13–2315 demonstrates, it is the obligation of the Attorney General to provide some evidence of the reasonableness of the scope of its request. While a degree of imprecision or over-inclusiveness may be acceptable in a request for information that is otherwise reasonable, speculation unsupported by facts is insufficient to force the disclosure of data from approximately 180 Western Union agents located in most of Sonora to which Arizona has failed to connect

---

6. Kelly's supplemental affidavit does set forth reasons he asserts that the two-tier approach would be unacceptable. But the approach he critiques in his supplemental affidavit is not that identified in the Anderson affidavit. Kelly criticizes a two-tier approach in which Western Union would analyze data and eliminate certain transactions from the information it would originally disclose to the Attorney General. But, as we understand the two-tier approach described in Anderson's affidavit, no such pre-screening would take place. Rather, certain personally identifying information would be withheld unless requested by the Attorney General after the Attorney General conducted his own analysis. Thus, Kelly's criticisms of the approach in his supplemental affidavit miss the mark.

any evidence of transactions possibly related to Arizona racketeering.[7]  *See Benson v. People*, 703 P.2d 1274, 1279–80 (Colo.1985) (quashing investigative demand for records of a business because "[t]he prosecution has presented no evidence, either by affidavit or otherwise, that establishes a relationship between [the business] and the purposes of the investigation.");  *see also Fed. Trade Comm'n v. American Tobacco Co.*, 264 U.S. 298, 306, 44 S.Ct. 336, 68 L.Ed. 696 (1924) ("Some ground must be shown for supposing that the documents called for do contain [evidence] ... and the ground and the demand must be reasonable.").  Because we find that the breadth of the Attorney General's request was not reasonable in light of the justification offered for it, we vacate the trial court's enforcement of the request pursuant to § 13–2315.

## B.  A.R.S. § 6–1242(A)

¶ 51 The Attorney General further asserts that the scope of his request is authorized by A.R.S. § 6–1242 which explicitly permits him to "conduct investigations within or outside this state."  Section 6–1242 authorizes the Attorney General to undertake investigations for either of two purposes.  First, the Attorney General may investigate "to determine if a licensee ... has failed to file a report required by this article."  Second, the Attorney General may investigate whether "[any] person engaged in a trade or business ... has engaged in or is engaging in an act, practice or transaction that constitutes a money laundering violation as provided in § 13–2317."  The Attorney General asserts that either of these reasons justifies the scope of its request for information to Western Union.  We disagree and address each in turn.

### 1.  The Extraterritorial Application of A.R.S. § 6–1241(A) (2007) Is Limited.

■ ¶ 52 Section 6–1242 gives the Attorney General authority to investigate whether Western Union has filed the Suspicious Ac-

tivity Reports ("SARs") required by § 6–1241(A).  The Attorney General argues that, appropriately interpreted, § 6–1241(A) requires Western Union to file such reports in Arizona as to any suspicious and qualifying wire-transfer it makes from any of its worldwide locations even if such transactions occurred entirely out of this state.  As a consequence, the Attorney General argues that the authorization given him to investigate whether Western Union violated this reporting obligation is not limited by any requirement that the underlying wire transfer or transfers have any connection with Arizona.  The plain text of the statutory scheme in which A.R.S. § 6–1242 is placed, however, does not support this argument.

¶ 53 Sections 6–1241 and –1242 are both located in chapter 12 of Title Six of the Arizona Revised Statutes; this chapter regulates transmitters of money.  Section 6–1202(C) (2007), also contained in that chapter, sets forth the extent of Arizona's power to regulate money transmitters.  Not surprisingly, the limits it sets forth on the extraterritorial application of its regulation of money transmitters are in many respects identical to the limits of the extraterritorial application of Arizona criminal law to conduct occurring outside the state.  That statute specifies:

> A person engages in business activity regulated by this chapter in this state if any of the following applies:
>
> 1.  Conduct constituting any element of the regulated activity occurs in this state.
>
> 2.  Conduct occurs outside this state and constitutes an attempt, offer or conspiracy to engage in the activity within this state and an act in furtherance of the attempt, offer or conspiracy occurs within this state.

A.R.S. § 6–1202(C).

¶ 54 Thus, the obligation of Western Union to report suspicious wire transactions that

---

7.  The superior court noted that the statute only permitted the Attorney General to release information obtained in his investigation "in the proper discharge of official duties."  Assuming that this would place some limits on the release of the information obtained, it still does not establish that the Attorney General complied with the statutory requirements for obtaining the information in the first place.

occur out-of-state is governed by the limits placed in § 6–1202(C). "Statutory provisions are to be read in the context of ... the overall statutory scheme." *Prudential*, 192 Ariz. at 148, 962 P.2d at 222 (quoting *Goulder*, 177 Ariz. at 416, 868 P.2d at 999).

¶ 55 As a result, the statute does impose an obligation on Western Union to file SARs as to qualifying transactions that occur outside the state of Arizona, but only to the extent that those transactions have the connection to the State of Arizona required by § 6–1202(C).[8]

¶ 56 Because the scope of the reporting obligation is so limited, the Attorney General can establish no violation of the reporting obligation set forth in § 6–1241(A) without first establishing the required connection between the underlying wire-transfer and Arizona. Because we reject the Attorney General's expansive interpretation of the scope of § 6–1241(A), we also reject his dependent argument that the scope of his investigative authority pursuant to § 6–1242(A) is not limited by some relationship between the documents sought and activity subject to regulation in Arizona. Accordingly, § 6–1242 does not afford the Attorney General the unlimited right to request records of transactions unless the Attorney General has a reasonable basis to believe that the scope of the request is targeted to wire-transfers that bear some relationship to activity subject to regulation in Arizona. *Herndon*, 119 Ariz. at 456, 581 P.2d at 690.

¶ 57 For the reasons discussed in our analysis of § 13–2315 above, the Attorney General has offered no reasonable basis to believe that the data he requests from those Sonoran locations, other than the identified border locations, would reflect contact with Arizona business activity subject to regulation by Chapter 12 of Title Six. In the absence of such a connection, the request for information is not authorized by § 6–1242. *See Benson*, 703 P.2d at 1279–80; *Fed. Trade Comm'n*, 264 U.S. at 306, 44 S.Ct. 336.

## 2. A.R.S. § 6–1242 Authorizes Investigations Into Specific Acts of Money Laundering.

■ ¶ 58 Nor can the Attorney General justify the scope of his present request by asserting that § 6–1242 authorizes the request because it allows the Attorney General to investigate whether "a licensee, authorized delegate, money transmitter, financial institution or person engaged in a trade or business ... has engaged or is engaging in an act, practice or transaction that constitutes a money laundering violation as provided in § 13–2317." Unlike § 6–1242 does not authorize investigative requests relating to classes of crimes in general. As it did with the investigative authority it granted to the Attorney General under the Consumer Fraud Act discussed in *Herndon*, the Legislature limited the Attorney General's investigative authority under this provision of § 6–1242 by requiring that the investigation concern whether a specified entity "has engaged or is engaging" in an act that constitutes money laundering under Arizona law. As we noted in *Herndon*, when the Legislature imposes such limitations on investigative power it presumably does so to "prevent the abuses or excesses which might result from unlimited powers of investigation." *Herndon*, 119 Ariz. at 456, 581 P.2d at 690.

¶ 59 We do not perceive the Attorney General to allege that Western Union has engaged or is engaging in money laundering. Yet, in justifying his request pursuant to § 6–1242, the Attorney General does not identify any entity that "has engaged or is engaging in an act" that he believes "constitutes a money laundering violation as provided in § 13–2317." He thus has not demonstrated compliance with that part of the statute by which the reasonableness of his investigative requests may be evaluated.

¶ 60 Moreover, the Legislature has designated by statute, A.R.S. § 13–2317 (Supp. 2006), the particular money-laundering crime the Attorney General may investigate pursuant to § 6–1242. Similar to the analysis above concerning § 13–2315, to charge and

---

8. This appeal does not oblige us to consider the extent to which Western Union would have to be aware of this Arizona connection to be criminally liable for failing to file a report of an extraterritorial transfer.

hence to investigate that crime, the Attorney General must establish a minimal basis on which a court can conclude that the scope of the documents sought in the investigation bears a reasonable relation to the crime of money laundering that would be chargeable in Arizona. Again, the Attorney General has not established such a connection between Arizona and a great number of the locations from which he seeks transaction records. His broad investigative request for all the records for all Western Union locations in Sonora is therefore not justified.

## CONCLUSION

¶ 61 Because the Attorney General has failed to identify any facts that would justify a request of the breadth he seeks to enforce, the superior court's order enforcing the request is vacated, and this matter is remanded to determine what part, if any, of the request is enforceable pursuant to the standards set forth in this opinion.

CONCURRING: JOHN C. GEMMILL and LAWRENCE F. WINTHROP, Judges.