416 P.2d 416

**Robert ONG HING, Petitioner,**

v.

**The Honorable Edwin R. THURSTON, Judge of the Superior Court of Maricopa County, Respondent.**

No. 8796.

Supreme Court of Arizona.

In Banc.

July 8, 1966.

Stockton & Hing, by Henderson Stockton, Phoenix, for petitioner.

Jennings, Strouss, Salmon & Trask, by Rex H. Moore and Rex E. Lee, Phoenix, amicus curiae.

UDALL, Justice.

This is an original proceeding wherein Robert Ong Hing, hereinafter called petitioner, seeks a writ of certiorari or, in the alternative, a writ of prohibition to prohibit, compel and direct judge Edwin R. Thurston, hereinafter referred to as respondent, from enforcing or in any manner carrying out his order of June 1, 1966, which found petitioner guilty of contempt of court and imposed a fine of $500 to be paid within 48 hours, or be incarcerated in the county jail for fifteen days. After a hearing, we issued an alternative writ of prohibition.

The facts on which the writ was issued are: On May 5, 1966, the First National Life Insurance Company held its annual shareholders' meeting in Pheonix, Arizona. Some of the shareholders, being dissatisfied with the procedure followed and the results of this meeting, filed an action in the Superior Court of Maricopa County on May 12, 1966, alleging various irregularities with respect to the conduct of the meeting, and obtained a restraining order postponing announcement of the results of the election. The title of this action was Dempsey-Tegeler & Co., Inc., et al., v. Goldberg, et al., and this action carried Cause No. 188223.

On May 16, 1966, the First National Life Insurance Co., one of the defendants in Cause No. 188223, filed a separate action as plaintiff, designated as No. 188345, attacking the validity of proxies solicited by Dempsey-Tegeler & Co., Inc., on the grounds of misrepresentation and also because of other alleged illegalities.

At the conclusion of a hearing in Cause No. 188223, respondent directed counsel to appear before him on May 21, at which time findings of fact were completed. Included in the order on that date was an appointment of a Special Master and his directions with respect to a shareholders' meeting which was ordered to be held on May 27, 1966. A portion of respondent's

restraining order on this date was as follows:

"That all parties hereto, and all persons having knowledge of this order on the Court's own motion be and they are hereby restrained from interfering with or obstructing the Special Master in any manner in discharging his duties hereunder and from in any manner interfering with or obstructing the orders, requirements, directions and instructions herein made and provided by the Court."

Petitioner was a party to this action as well as attorney for the defendants.

Petitioner filed a notice of appeal from the above-mentioned order to the Court of Appeals and filed an application for Stay of Order on Appeal before respondent. The application for stay was denied by respondent and on May 25, 1966 petitioner filed a petition for Stay of Order on Appeal in this Court. On May 26, 1966 this Court denied the petition for Stay of Order on Appeal.

On May 26, 1966 petitioner appeared before the Special Proceedings Judge of the Superior Court of Maricopa County and, upon advising the judge that the restraining order which he then sought [in Cause No. 188345] was in a completely separate cause from No. 188223, he obtained an order restraining certain of the Dempsey-Tegeler group from voting certain proxies at the May 27th meeting.

This second restraining order was served just prior to the Special Master's convening the shareholders' meeting the morning of May 27th. After such service, the Special Master recessed the meeting until later the same day. The defendants, in Cause No. 188345, filed a motion for an order vacating the second restraining order and obtained an order for an immediate hearing of said motion. The motion was assigned to the presiding judge and was heard by him on the same day. After vacating the temporary restraining order in Cause No. 188345, he ordered that Cause No. 188345 be consolidated with Cause No. 188223 and to thereafter proceed as No. 188223.

While the above motion was being heard, and in which petitioner was appearing as an attorney of record and a party, an associate of petitioner appeared ex parte before another judge and obtained a restraining order in Cause No. 188223 which was served and restrained the Special Master and others from carrying out the order of respondent with respect to the recessed shareholders' meeting. Apparently, when presented with this third restraining order in Cause No. 188223, the judge commented to the effect that there was a hearing going on in that matter at that moment and apparently the representation was made that the hearing was in Cause No. 188345 and that the instant restraining order being sought was in Cause No. 188223 and that they were different. Upon this assurance, the judge issued the restraining order sought, which was retained by petitioner's associate and held by him until after the ruling was made on the motion that was being heard. This ruling was contrary to petitioner's contention and as the Special Master and others left the courtroom, the Special Master was served with the restraining order.

Prior to May 27, 1966, respondent had advised all parties that he had made arrangements to, and that it was necessary for him to be out of the city of Phoenix on the date of the shareholders' meeting. Upon returning to his office on May 31, respondent was advised of the above developments in this matter whereupon he notified petitioner to appear in his court at eleven o'clock a.m. on June 1, 1966. There is no indication that petitioner was advised as to the nature of said proceedings or what was to be taken up at said hearing. Petitioner appeared on June 1, 1966 and the proceedings began by respondent calling on the judge who issued the second restraining order to make a statement in open court concerning the circumstances surrounding the issuance of the restraining order· and order to show cause. Respondent then had

read into the record a statement which had been made by the judge who issued the order on May 27, 1966, concerning the issuance by him of the temporary restraining order and order to show cause. Thereupon, the court asked the Special Master, petitioner, petitioner's associate and counsel for the opposing party to clarify or elaborate concerning the circumstances surrounding the issue of the two restraining orders and orders to show cause. Thereafter, respondent entered an order finding petitioner guilty of contempt of court because of his action and conduct in Cause No. 188345 and Cause No. 188223.

Petitioner contends he has no plain, adequate or speedy remedy from the judgment of contempt entered by respondent on June 1, 1966, and no appeal therefrom. In addition, petitioner alleges that respondent has clearly taken this action in violation of due process of law in that petitioner was never advised or informed of the nature of the proceedings held on June 1, 1966 until such time as respondent actually entered his order of contempt.

There are two questions presented by this matter:

(1) Whether respondent employed proper procedures in issuing this contempt decree?

(2) Was petitioner's conduct contumacious?

In view of our determination of the first question, we find it unnecessary to comment upon petitioner's conduct.

Petitioner contends that if his conduct was in contempt of court, it was of such a nature to be classified as criminal contempt and therefore comes within the provisions of A.R.S. §§ 12–861 through 12–863 instead of A.R.S. § 12–864. A reading, analysis, and comparison of A.R.S. § 12–861 to § 12–864 indicates we are dealing with two different subjects, with totally different procedures and results.

First, A.R.S. § 12–861 states:

"A person who wilfully disobeys a lawful writ, process, order or judgment of a superior court by doing an act or thing therein or thereby forbidden, if the act or thing done also constitutes a criminal offense, shall be proceeded against for contempt as provided in §§ 12–862 and 12–863."

The two statutes mentioned in the above quoted statute provide, among other things, that the proceeding shall include an order to show cause, service, return, attachment of person or sequestration of property, jury trial, sentence, fine and appeal.

In the same article with the above statute is A.R.S. § 12–864 which provides:

"Contempts committed in the presence of the court or so near thereto as to obstruct the administration of justice, and contempts committed by failure to obey a lawful writ, process, order, judgment of the court, and all other contempts not not specifically embraced within this article may be punished in conformity to the practice and usage of the common law."

This, of course, is the traditional contempt power inherent in the judiciary branch of our government.

There is an apparent inconsistency in these statutes which has resulted in confusion in the past, and is presented again in this matter. In commenting on the difference in the statutes, we stated in In re Wright, 36 Ariz. 8, 281 P. 944, that: " * * * as we understand section 4471 [§ 12–861], before the accused can invoke its procedure it must not only appear that his act is a criminal offense, but also that his act must consist in doing something *forbidden* by 'lawful writ, process, order or judgment.' " Thus, one distinction is that pursuant to A.R.S. § 12–861 the act must be criminal and forbidden by a judicial order, while A.R.S. § 12–864 is couched in the wording of "failure to obey a lawful writ, process, order, judgment of the court, * * *." The latter punishes inaction, whereas the former requires the doing of some act which is forbidden or proscribed by the court. It is apparent that a court order may not only forbid an act,

but may at the same time require conduct as to come within the scope of A.R.S. § 12–864. The same conduct may be implicitly forbidden in an order punishable pursuant to A.R.S. § 12–861 and also fail to obey the mandates of a court order within the provisions of A.R.S. § 12–864. Accordingly, one quite often reaches an impasse, because of semantic distinctions. The restraining order in this case is a good illustration of this conflict.

Another approach to this particular problem is to research the history and purpose of the contempt statutes and try to resolve any conflict by this method. We turn to former cases in our state for this information. Once again the case of In re Wright, supra, is helpful as we stated therein:

"These statutory provisions of ours classifying and regulating the procedure in certain specific contempts were passed by our Legislature originally in 1913. * * It is generally understood that they were copies of what is commonly known as the Clayton Act, at that time pending in Congress but not enacted as a federal law until October 15th, 1914. Chapter 323, 38 Stats. at L. 738, 739, §§ 21, 22, Comp.St., §§ 1245a, 1245b; 6 Fed.Stat. Ann., (2d Ed.) pp. 141, 142 * * * [18 U.S.C.A. § 402]. There were verbal differences from the congressional act to meet local conditions, but otherwise our statute as originally passed was the same as the Clayton Act."

The fountainhead of A.R.S. § 12–864 reads as follows:

"Sec. 24. That nothing herein contained shall be construed to relate to contempts committed in the presence of the court, or so near thereto as to obstruct the administration of justice, nor to contempts committed in disobedience of any lawful writ, process, order, rule, decree, or command entered in any suit or action brought or prosecuted in the name of, or on behalf of, the United States, but the same, and all other cases of contempt not specifically embraced within section twenty-one of this Act, may be

punished in conformity to the usages at law and in equity now prevailing." 38 Stat. 739, 740, § 24.

The only significant difference in the Act as originally enacted and our present A. R.S. § 12–864 is that the latter does not contain the phrase, "Nothing herein contained shall be construed to relate to * * *." However, as originally adopted by our legislature, the above phrase was included in our laws. R.S. § 1803, 1913. In the Revised Code of 1928 the phrase was omitted without explanation. R.C. § 4474, 1928. The statute was carried forward from 1928 in the 1939 Code as § 27–604.

The phrase referred to is important in the interpretation of the statute as shown by the case of Hill v. United States ex rel. Weiner, 300 U.S. 105, 57 S.Ct. 347, 349, 81 L.Ed. 537. This case in construing §§ 21, 22, and 24 of the Clayton Act stated that "The object of section 24 clearly was to limit the application of the provisions of section 22, and the other sections named, to prosecutions for contempt arising out of cases instituted by private litigants." The Court reasoned that the specific exception contained in section 24—"nothing herein contained"—applied to all other provisions of the Clayton Act as to prosecutions for criminal contempts, but that § 24 proceedings were not subject to the requirements set forth in the other sections. United States v. Goldman, 277 U.S. 229, 48 S.Ct. 486, 72 L.Ed. 862; Green v. United States, 356 U.S. 165, 78 S.Ct. 632, 2 L.Ed.2d 672. See also, A.R.S. § 13–341.

■ We do not believe the legislature, by the omission of this phrase, intended to limit the inherent power of the judiciary to punish contempt if necessary to uphold and protect judicial processes from being brought into disrepute. There is little doubt but that the words "nothing herein contained" were omitted because they were superfluous and the meaning was still intended. This construction of the statutes is compatible and provides a workable contempt procedure. If a party litigant initiates the criminal contempt proceedings,

then A.R.S. §§ 12–861 through 12–863 plus 12–865 are applicable. The court may commence criminal contempt proceedings to uphold the dignity of the judicial system, and may punish in conformity with the practices and usage of the common law pursuant to A.R.S. § 12–864.

The facts of this case indicate that for either, or both, of the two constructions of the statutes, this matter must be determined pursuant to A.R.S. § 12–864. Certainly, the proceeding was not commenced by a party litigant, but by the respondent. Neither can we say the restraining order specifically forbade an act particularly in regard to cause No. 188345. We find the proceeding was properly initiated according to A.R.S. § 12–864.

Therefore, the criminal contempt we are dealing with under A.R.S. § 12–864 is different from the criminal contempt referred to in A.R.S. §§ 12–861 through 12–863. While it carries the same label, the proceedings are entirely different. The mere label is not determinative of the question. It must be determined who instituted the proceeding—the judge or a party litigant—as well as a determination of the nature of the act; whether it is failure to obey an order or doing a forbidden criminal act.

Any act which is calculated to hinder, obstruct or embarrass a court in the administration of justice, or which lessens the dignity or authority of a court may be defined as contempt. Contempt has been broken down into four classifications: criminal contempt is the commission of a disrespectful act directed at the court itself which obstructs justice, Van Dyke v. Superior Court, 24 Ariz. 508, 211 P. 576; civil contempt is the disobeyance of a court order directing an act for the benefit or advantage of the opposing party to the litigation, Van Dyke v. Superior Court, supra.; direct contempt is an act committed in the presence of the court or so near thereto as to obstruct the administration of justice, In re Pugh, 30 Ariz. 129, 245 P. 273; and constructive or indirect contempt is an act committed outside the presence of

the court, In re Quan, 39 Ariz. 13, 3 P.2d 522. There must always be some combination of these classifications. Also, the same acts may be both criminal contempt and civil contempt, and quite often are. The classification of contempt as criminal, civil, direct or indirect is merely a judicial device for determining the procedure to follow in each case. We are satisfied that we are dealing with a criminal contempt as the primary purpose of respondent's action was to punish for petitioner's alleged disrespect to the court and attempted obstruction of justice.

We have stated:

"The superior court of Maricopa county is an entity. Its separation into divisions is purely imaginary and for convenience only. The jurisdiction of the court, no matter by which judge it is exercised, is that of the whole court, and not of one judge nor division thereof." Peterson v. Speakman, 49 Ariz. 342, 66 P.2d 1023.

The word "court" as used in A.R.S. § 12–864 seems to fit the definition of court as "* * * an organization composed of individuals, established for the administration of justice." Peterson v. Speakman, supra. The punitive aspect of the contempt power is addressed to the court as a whole but it is only exercised through individuals. The very nature of any contemptuous act requires, in most instances, jurisdiction to punish for such conduct by the individual judge. While each and all of the judges possess the contempt power as members of the same tribunal, the exercise of such power is singular rather than unanimous. It is a reasonable and practical solution to conclude that the contempt statutes are directed to the particular judge of the court instead of the broader definition of the word.

The origin and history of our contempt statutes reveal, as indicated earlier, that they were adopted in 1913. The adoption of these statutes antecede the Peterson v. Speakman case, supra, which dealt with a constitutional provision concerning com-

pensation of public officers. In 1948, a constitutional provision was added making the superior courts of this state a single court. Ariz.Const. Art. 6, § 25, (now Ariz. Const. Art. 6, § 13, A.R.S.). Neither the *Peterson* case nor the constitutional provision was intended to derogate from the power of superior court judges to exercise the contempt power. Clearly we have one superior court in this state today, but a contemptuous act before one judge may not necessarily permit punishment to be imposed by all superior courts. The same rationale applies to divisions of the superior court in counties that have more than one judge.

The reason for differentiating contempt is that direct contempt may be adjudicated summarily and an indirect contempt requires that the alleged contemnor be given advance notice of the charge, an opportunity to be heard, and present testimony in his own behalf. The party is entitled to his day in court.

A.R.S. § 12–864 defines direct contempt as acts "committed in the presence of the court or so near thereto as to obstruct the administration of justice * * *." Or as was aptly stated in In re Pugh, supra, " 'It is the almost universal rule that, where the contempt is direct, in the immediate presence of the court, summary punishment may be inflicted, without affidavit, notice, rule to show cause, or other process.' " 30 Ariz. at 132, 245 P. at 274.

Courts disagree as to the meaning of the phrase "in the presence of the court or so near thereto as to obstruct the administration of justice," which, of course, is direct contempt. Some courts hold that only those acts within the ocular view, or range of vision, are within the meaning of the phrase. State v. Root, 5 N.D. 487, 67 N.W. 590. Another interpretation would include the courtroom facilities, the judge, the jury, and jury room all combined. In re Caruba, 139 N.J.Eq. 404, 51 A.2d 446.

Regardless of the definition adopted for the phrase by other courts, our prior decisions require a finding of indirect contempt in the present case, if the conduct is found contemptuous. In the case of In re Quan, 39 Ariz. 13, 3 P.2d 522, this Court said the failure to comply with a court order directing the payment of attorneys fees was constructive contempt, not one committed in the presence of the court, and defendant could not be punished summarily. We further stated that indirect contempt involves " 'matters that arise at a distance and of which the court cannot have so perfect a knowledge unless by the confession of the party or the testimony of others * * *.' " 39 Ariz. at p. 16, 3 P.2d at p. 524. Previously, this Court in State v. Superior Court, 30 Ariz. 332, 246 P. 1033, was presented with the problem of a violation of a court order. This case dealt with a release of a prisoner by the superintendent of the State Prison. The superintendent was cited for contempt but only after he had filed a return seeking to explain his actions. While this case discussed direct contempt, the facts indicate an opportunity was given to explain the alleged misconduct. It is significant that in each of these cases, the alleged contemnor was given an opportunity to explain any violation of the court's order.

The facts in the instant case indicate that the contempt proceedings arose out of an alleged violation of the restraining order issued by respondent on May 21, 1966. The court had jurisdiction and authority to issue such an order. The factual situation out of which this matter arose was atypical of civil litigation, and we assume for the purpose of this decision the attorneys acted in good faith. It is, however, possible for an attorney to become so zealous in the manner of protection of his client as to interfere with the administration of justice. The confusion in this matter arose because of the number of suits filed by the parties. Petitioner contends that the two actions were separate though related and that he could pursue the two independently. We need not determine at this time the relationship of the suits and whether the petitioner's conduct was contumacious. It is sufficient to say that any violation of the first

restraining order occurred outside the presence of respondent.

The cases were not consolidated until May 27, 1966, and there is nothing in the record showing that both cases had been permanently assigned to one judge. There is no doubt that cause No. 188223 was assigned to respondent from the beginning and failure to obey an order arising from this matter could, absent an explanation, come within the traditional definition of contempt.

An important consideration is that respondent did not have personal knowledge that petitioner violated the restraining order since the alleged violation did not take place in his presence. At the hearing, respondent relied upon the testimony of others and documentary evidence in the case file to ascertain if an act of contempt had occurred. This places the matter within our holding of In re Quan, supra, as respondent's knowledge was not so perfect as to be permitted to punish summarily. It follows that any contempt in this matter was indirect and petitioner was entitled to procedural due process, i. e., notice of the charges against him and an opportunity to be heard. In re Quan, supra.

It is urged that petitioner's conduct, as unexplained, comes perilously close to being so near the court as to obstruct the administration of justice. Our answer to this is that whenever there is doubt as to the character of the alleged contempt, as here, justice is better served by giving an alleged contemnor his day in court rather than summarily holding him in contempt. Ex parte Hennies, 33 Ala.App. 377, 34 So.2d 22; Ex parte Redmond, 159 Miss. 449, 132 So. 328; Spriggs v. Pioneer Carissa Gold Mines, Inc., Wyo., 378 P.2d 238; 17 C.J.S. Contempt § 4, p. 6.

The legal profession, the parties to an action, and the public are assured of fundamental rights by adequate procedural safeguards in contempt proceedings. Nor, does this impair the power of the courts to uphold the dignity and authority of the judicial system by exercising the power of contempt in a judicious manner. Direct contempt may be dealt with expeditiously and summarily. Indirect contempt can be as effective as direct contempt in manner of punishment. The only difference is that the judicial system will afford an individual an opportunity to be heard, and explain the conduct and actions, if the conduct is indirect contempt.

The Supreme Court of the United States, in a recent decision, expressed an opinion in this area that is helpful:

"* * * Summary procedure, to use the words of Chief Justice Taft, was designed to fill 'the need for immediate penal vindication of the dignity of the court.' * * * We start from the premise long ago stated in Anderson v. Dunn, 6 Wheat, 204, 231, 5 L.Ed. 242, that the limits of the power to punish for contempt are 'the least possible power adequate to the end proposed.' In the instant case, the dignity of the court was not being affronted: no disturbance had to be quelled; no insolent tactics had to be stopped." Harris v. United States, 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240.

When all of the circumstances are considered, the proper procedure in this case is to permit petitioner to explain his acts and have reasonable notice of the contempt hearing.

For the reasons stated, the alternative writ of prohibition heretofore granted in this matter is hereby made permanent.

STRUCKMEYER, C. J., BERNSTEIN, V. C. J., and McFARLAND, J., concur.

NOTE: Justice LORNA E. LOCKWOOD did not participate in the determination of this cause of action.