261 P.3d 456

William LUND and Sherry L. Lund, husband and wife; Sandra Slaton, counsel for William and Sherry Lund, Petitioners,

v.

The Honorable Gary E. DONAHOE, Judge of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Judge,

Diane Disney Miller, an individual, Kristen Lund Olsen, Karen Lund Page, Michelle A. Lund, Real Parties in Interest.

Joel E. Sannes, Esq.; Rachel and Robert Schemitsch; Sabrina Lovejoy, Petitioners,

v.

The Honorable Gary E. Donahoe and the Honorable Robert D. Myers, Judges of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Judges,

Diane Disney Miller, an individual, et al., Real Parties in Interest.

Bradford D. Lund, Petitioner,

v.

The Honorable Gary E. Donahoe, Judge of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Judge,

Diane Disney Miller, an individual, Kristen Lund Olsen, Karen Lund Page, Michelle A. Lund, Real Parties in Interest.

Nos. 1 CA–SA 11–0026, 1 CA–SA 11–0030, 1 CA–SA 11–0036.

Court of Appeals of Arizona, Division 1, Department E.

July 28, 2011.

Slaton Law Office, P.C. By Sandra Slaton, Scottsdale, Petitioner and Attorney for Petitioners William and Sherry Lund.

Burch & Cracchiolo, P.A. By Daniel Cracchiolo, Daryl Manhart, Brian F. Murphy, Clarissa Reiman, Jessica Conaway, Phoenix, Attorneys for Respondents Diane Disney Miller, Kristen Lund Olsen, Karen Lund Page, and Michelle A. Lund.

Lake & Cobb, PLC By Joel E. Sannes, Tempe, Petitioner and Attorney for Petitioners Rachel and Robert Schemitsch and Sabrina Lovejoy.

Shumway Law Offices, PLC By Jeff A. Shumway, Scottsdale, Attorneys for Petitioner Bradford D. Lund.

## OPINION

SWANN, Judge.

¶ 1 In this guardianship proceeding, an expert witness complained to the court about the burden posed by a subpoena for records. Within days, the court *sua sponte* set a show-cause hearing concerning possible sanctions. Before the hearing, the court announced its view that the subpoena represented an abuse of the discovery process and had been served as a means of harassing the witness. At the show-cause hearing, the court issued an order of confinement that resulted in a lawyer being handcuffed in open court when he declined to answer questions under oath that would have invaded the attorney-client privilege pursuant to a common interest agreement. Several attorneys subject to the ensuing sanctions order now seek special action

relief. We conclude that the trial court's actions constituted a clear abuse of discretion, and we therefore accept jurisdiction and grant relief.

## FACTS AND PROCEDURAL HISTORY

¶ 2 In October 2009, relatives of Bradford Lund (collectively "Petitioners") petitioned the probate court to appoint a guardian, conservator, guardian ad litem, and next friend for him. Lund and other family members opposed the petition. The probate court eventually appointed Dr. Pamela Willson to conduct a competency evaluation of Lund.

¶ 3 Joel Sannes, an attorney for Mr. Lund's sister, notified all counsel and Lund's court-appointed guardian ad litem that he would issue a records-only subpoena to Dr. Willson. Sannes provided counsel a copy of the subpoena before it was served. The subpoena was served eight days later and requested:

> [c]opies of any and all reports you have written or signed after January 1, 2005 concerning or related to the competency or capacity of any person, but only if the reports were prepared, provided or disclosed in connection with your appointment in any case filed in any court in the State of Arizona, or in connection with any services where you were engaged as an expert witness or consultant to give opinions related to any case filed in any court in the State of Arizona.

The subpoena also explained Dr. Willson's duties and rights in responding to the subpoena, including her right to make a written objection pursuant to Ariz. R. Civ. P. 45.[1] The letter attached to the subpoena asked Dr. Willson to create a "privilege log" to identify and describe "all documents and information not produced."

¶ 4 Dr. Willson did not serve an objection pursuant to Rule 45. Instead, and almost immediately after receiving the subpoena, she telephoned the assigned trial judge and resigned from the case. She confirmed her resignation in a one-page letter to the court the same day and complained about the subpoena:

> With your permission, I am resigning as Court-appointed examiner in the matter of Bradford Lund, effective immediately. My office has already wasted a lot of time trying to schedule appointments in this case, and just as we have again been asked to set up 'tentative' evaluation dates, I've received a subpoena from attorney Joel Sannes, representing Rachel Schemitsch.
>
> . . . .
>
> To comply [with the subpoena] will require my going one-by-one through over 700 reports to determine the nature of the issues I addressed and my specific role in each matter. Some of the cases have involved confidential work product, and in other cases my report has been sealed by the Court, but I'm not always told of that decision when it's part of a settlement agreement, so I have no idea how to even identify many of those cases.
>
> As a solo practitioner, I haven't got the time or office staff to respond to this subpoena, and am unwilling to waste time trying to accommodate [sic] the maneuvering on all sides of this case, which promises to continue unabated. The case has been a time-consuming nuisance, and there are other matters where my professional energy will be put to much better use.

The court revealed at a November 1, 2010 status conference that it had attempted unsuccessfully in an off-the-record telephone conference to convince Dr. Willson not to resign.

¶ 5 At the November 1 status conference, the court—without permitting counsel to be heard—characterized the subpoena as "completely uncalled-for" and "overbroad and oppressive ... intended more for harassment than anything else." The court *sua sponte* quashed the subpoena and ordered Sannes and his clients to appear November 4 to show cause why the court should not order sanctions against Sannes or his clients. It also ordered "[a]ny other attorney that participated with Mr. Sannes in the decision to serve this subpoena" (collectively, the "Attorneys") to appear along with their clients for

---

**1.** Citations to Rule 45 refer to the 2008 revisions in effect at the time.

the same purpose. The court further explained:

> if this was part of a joint litigation strategy where Mr. Sannes ran the idea by other counsel before serving the subpoena, you'll need to tell me about your involvement on Thursday, and I'll decide whether any sanctions are appropriate.

¶ 6 In response, the Attorneys submitted memoranda asserting that the subpoena appropriately sought records to prepare for cross-examination of a court-appointed expert and that Ariz. R. Civ. P. 45 provided Dr. Willson a simple means to limit the scope of the subpoena and "absolve her of any need to respond." The memoranda also confirmed that the Attorneys were parties to a Common Interest Agreement ("CIA"), and asserted that the attorney-client privilege required them "to maintain the confidentiality of any 'discussions' . . . regarding the Subpoena."

¶ 7 At the November 4 hearing, the court announced it would "deal with Mr. Sannes first" and asked him to present "any reason . . . not to be sanctioned" for issuing the subpoena. Through counsel, Sannes presented argument concerning the validity of the subpoena. He argued that he had been unaware of the large body of material responsive to the subpoena and noted that Dr. Willson could easily have limited the scope of the subpoena pursuant to Ariz. R. Civ. P. 45. The court rejected his argument and ordered Sannes to come forward and be placed under oath.

¶ 8 After acknowledging that Sannes and some of the Attorneys had executed a Common Interest Agreement, the court asked Sannes to identify all parties to that agreement. When Sannes asserted that the information was itself privileged, the court rejected his argument and ordered him to answer the question or be held in direct civil contempt. The court also refused Sannes's request, through counsel, to stay its order to allow Sannes time to seek special action relief. On advice of counsel, Sannes then disclosed the names of the attorneys who were parties to the joint defense agreement. The court then asked whether "the decision to issue this subpoena and serve it on Dr. Willson was a joint decision of all the parties to the agreement?" After explaining that he could not answer the question "without disclosing . . . the nature of the conversations," Sannes declined to answer. The court then held Sannes in direct contempt and issued an order of confinement that resulted in Sannes being handcuffed in the courtroom. Sannes's counsel orally moved for reconsideration, and the court denied the motion without discussion.

¶ 9 Having determined that issuance of the subpoena was sanctionable, the court then purported to hold a "culprit hearing" and questioned other Attorneys—while Sannes remained handcuffed—to determine whether there was a "joint agreement essentially to abuse the discovery process."

¶ 10 The court rejected additional argument from the Attorneys that a five-year request for expert records was standard discovery practice. Though it conceded that an identical subpoena might be appropriate in some cases, the court concluded that the subpoena was inappropriate in this case because discovery into the underlying details of Dr. Willson's 700 opinions would have been too burdensome. The court stated that counsel had no right to examine documents to test the witness's answers to deposition questions concerning her past work, and opined that it would be irrelevant even if Dr. Willson had issued 700 opinions that all came to the same conclusion.

¶ 11 In the face of the Attorneys' refusal to disclose the substance of their communications concerning issuance of the subpoena, the court stated "because nobody has denied it, I'm just going to assume that everybody participated and agreed to it" and announced its intention to sanction all counsel:

> I know Mr. Sannes signed the subpoena and issued it. But the rule about sanctioning folks for violating their duties in issuing a subpoena isn't—the language isn't limited to the person who issued the subpoena. And I think the Court has an inherent authority to determine if there are a group of lawyers that basically got together and said, "We're going to do this. Mr. Sannes, you issue the subpoena," find

out what happened. And that's what I'm doing here today.

. . . .

So, again, unless the lawyers want to tell me that they didn't participate and didn't agree that this subpoena—subpoena should be issued, I'm going to assume everybody did. I don't see any distinction between what the lawyer culprit cases that you've tried to distinguish and this. This subpoena was issued by a lawyer for the benefit of at least one client, but it appears to me that it was issued for the benefit of all of the parties to this joint agreement. So I think you're all subject to sanctions.

¶ 12 The remaining Attorneys presented argument, and objected to the court's conduct of the proceeding. The Attorneys also steadfastly declined to reveal information they deemed privileged. Though Sannes did not retreat from the assertion of privilege that led to his confinement, the court ordered him released from handcuffs and made its findings.

¶ 13 The court concluded that the subpoena was oppressive because it requested production of every report since January 1, 2005, and that its issuance before the conclusion of Dr. Willson's evaluation suggested a "purpose of harassment and delay." The court took under advisement the question whether it would issue any sanctions, but asked Petitioners to present "a ballpark estimate of expenses" to confirm the appointment of a new competency examiner and attend the November 1 and 4 proceedings.

¶ 14 In a minute entry filed November 8, the court found that four of the Attorneys "breached the duty imposed by Rule 45" and concluded that

an "appropriate sanction" must not only address the fact that the misconduct unreasonably expanded the litigation and caused Petitioners to incur additional fees ($6,546.25; this amount has been divided among the four attorneys), but also sanction counsel for abusing the discovery process and harassing the court-appointed examiner to the point that she withdrew,

thus causing the case, once again, to be substantially delayed.

The court ordered each of the Attorneys to pay $1,000 to the court clerk and $1,636.56 to opposing counsel. It also ordered them "to bear the cost of engaging in this blatant discovery abuse" by prohibiting them from charging their clients for activities relating to the subpoena.

¶ 15 The Attorneys filed motions for reconsideration and a motion requesting additional evidentiary hearings. Those motions were denied. The Attorneys' Petitions for Special Action followed.[2]

### JURISDICTION

¶ 16 A petition for special action is "the proper means to seek relief when a party believes a trial court has ordered disclosure of material protected by a privilege or work product shield." *Green v. Nygaard,* 213 Ariz. 460, 462, ¶ 6, 143 P.3d 393, 395 (App.2006) (internal quotation marks omitted). It is also appropriate when the issue involves application of a rule of civil procedure, when the issue is a pure question of law, and when the issue is one of first impression. *Id.* Finally, civil contempt adjudications may only be reviewed by means of a special action. *See Berry v. Superior Court,* 163 Ariz. 507, 788 P.2d 1258 (App.1989).

¶ 17 The court's use of its contempt power to discourage a lawyer from maintaining a colorable assertion of privilege—and its predicate finding that the Attorneys had engaged in *per se* discovery abuses—present legal questions of statewide importance. For this reason, we accepted jurisdiction immediately following oral argument.

### DISCUSSION

¶ 18 The Attorneys contend that the trial court had no legal basis for the sanctions imposed against them and that the information the court sought regarding their participation in issuing the subpoena was privileged. We agree.

¶ 19 We review the imposition of sanctions for an abuse of discretion. *Preci-*

---

2. Three separate Petitions were consolidated.

*sion Components, Inc. v. Harrison, Harper, Christian & Dichter, P.C.,* 179 Ariz. 552, 553, 880 P.2d 1098, 1099 (App.1993). "The trial court's findings of fact are binding on this court unless they are clearly erroneous or unsupported by any credible evidence." *Imperial Litho/Graphics v. M.J. Enter.,* 152 Ariz. 68, 72, 730 P.2d 245, 249 (App.1986).

## I. THE SUBPOENA WAS NOT PER SE IMPROPER.

¶ 20 First, we note that the court entered no orders limiting discovery until the November 1 status conference. There was therefore no reason for Sannes or the other Attorneys to suspect that the timing of the subpoena would be improper. Second, we note that this entire situation arose not because a party or witness lodged an appropriate objection pursuant to the governing rules, but because a court-appointed witness complained directly to the judge in a private telephone call. The first time any counsel had notice of the court's concern was at the November 1 status conference, when the court declared its view that the subpoena was intended to harass.

¶ 21 We agree with the Attorneys that the subpoena was a proper means of gathering information in anticipation of cross-examination relating to an expert's bias and methodology. "Arizona has a long-favored practice of allowing full cross-examination of expert witnesses, including inquiry about the expert's sources, relations with the hiring party and counsel, possible bias, and prior opinions," and allows "expansive pretrial discovery aimed at expert witnesses." *Ariz. Indep. Redist. Comm'n v. Fields,* 206 Ariz. 130, 143, ¶ 43, 75 P.3d 1088, 1101 (App.2003). *See also* Ariz. R. Civ. P. 26(d) (allowing the methods of discovery to be used in any sequence, unless the court orders otherwise); *Emergency Care Dynamics, Ltd. v. Super. Ct. (Stover),* 188 Ariz. 32, 36, 932 P.2d 297, 301 (App.1997) ("Arizona authorities consistently have supported free-ranging, skeptical cross-examination of expert witnesses and open

discovery to probe the groundwork for their opinions."). And a records-only subpoena is often a first step in gathering expert-bias evidence, especially in preparation for a deposition. *Amer. Fam. Mut. Ins. Co. v. Grant,* 222 Ariz. 507, 513, ¶ 22, 217 P.3d 1212, 1218 (App.2009).

¶ 22 Though overbroad subpoenas are not enforceable, *State ex rel. Goddard v. W. Union Fin. Serv., Inc.,* 216 Ariz. 361, 369, ¶ 38, 166 P.3d 916, 924 (App.2007), the subpoena here was not *per se* overbroad because it requested records from a five-year period. *See Amer. Fam.,* 222 Ariz. at 512–13, ¶¶ 17–18, 217 P.3d at 1218–19 (declining to set precise limits for records for bias-related discovery). When the subpoena was served, the Attorneys had no knowledge of the number of reports Dr. Willson had generated over that period.

¶ 23 While Dr. Willson's letter articulated the burden she felt the subpoena created for her, that burden could have been at least temporarily eliminated if she had sent a simple written objection to Sannes. *See* Ariz. R. Civ. P. 45(c)(5) (once a written objection is made, the duty to comply with a subpoena is suspended pending a court order). As Sannes argued, the next step would have been an effort to negotiate a mutually acceptable production, and failing that, a judicial determination of the proper scope of discovery.[3] *Id.* Had there been the opportunity for conference and motion practice that Rule 45 contemplates, the court would have been properly equipped to tailor Dr. Willson's discovery obligations to the needs of the case. *See* Rule 45(c)(3)(A); *Am. Family Mut. Ins. Co. v. Grant,* 222 Ariz. 507, 217 P.3d 1212 (App.2009).

¶ 24 Instead, the court concluded that the subpoena was *per se* abusive "in this type of case … where you're asking for *potentially* privileged documents." Ariz. R. Civ. P. 45(d)(2)(A), however, allows the recipient of a subpoena to exclude documents from produc-

---

3. We need not decide here whether the subpoena was overbroad in these circumstances, but we note that experts who are paid to testify in court should not be outraged or caught by surprise when they receive inquiries into the patterns that

their opinions may reveal. Such inquiries are essential to meaningful cross-examination and an understanding of the integrity of the methods the experts employ.

tion if the person *"expressly"* claims they are privileged. And the letter attached to the subpoena properly explained the avenue by which Dr. Willson could create a privilege log to identify information or documents that were not produced on grounds of privilege.

¶ 25 The trial court's conclusion that the subpoena was issued to harass or delay the proceedings was not supported by any evidence in the record. Without taking evidence on the issue, the court summarily concluded that "the oppressiveness and harassment" were "clearly set forth" in Dr. Willson's letter. The trial court made clear that the only evidence it was interested in receiving was the names of the Attorneys who participated in the CIA and those who agreed to issue the subpoena.

¶ 26 To summarize, the court (1) acknowledged that the precise subpoena at issue in this case might have been acceptable in another case, (2) bypassed the procedure provided by Rule 45 for the orderly resolution of objections, (3) held that if Dr. Willson had issued 700 opinions with identical conclusions, it would have had no relevance and (4) proceeded to find that the subpoena was intended to harass based upon a finding that "some things just kind of jump out at you. You can't articulate the reasons for it."

¶ 27 We conclude that the subpoena fell squarely within the zone of appropriate expert discovery. Though the circumstances of the case and the large volume of responsive material might well have warranted some modification of the subpoena's reach after discussion, there was nothing improper about it at the time it was served. On this record, even an order quashing the subpoena in its entirety would have been unwarranted. The order sanctioning counsel merely for serving it was a clear abuse of discretion. The court neither sought nor obtained evidence concerning any improper motive for the subpoena, and not even a court's inherent authority to redress abuses of the judicial process can support the imposition of sanctions based on vague hunches or inarticulable reasons.

## II. THE COMMUNICATIONS AMONG COUNSEL WERE PRIVILEGED.

¶ 28 The Attorneys vigorously, but respectfully, objected to the court's demand that they reveal which of them agreed to issue the subpoena, claiming that information was protected by the attorney-client privilege. The court rejected the claims of privilege, reasoning that it was asking about attorney "conduct," not "communications."

¶ 29 As we explain below, the fact that the Attorneys' clients' interests were sufficiently aligned to protect certain communications does not imply that counsel acted in concert or justify the imputation of misconduct (had any existed) by one to all. Moreover, the information the court sought—specifically which Attorneys were "for" or "against" the subpoena—was protected by an attorney-client privilege that was not waived because the Attorneys entered into a CIA.

¶ 30. Whether a privilege exists is a question of law that we review de novo. *Twin City Fire Ins. Co. v. Burke*, 204 Ariz. 251, 254, ¶ 10, 63 P.3d 282, 285 (2003). This court has recognized a "common interest doctrine" that permits "persons with common interests to share privileged attorney-client and work-product communications in order to coordinate their respective positions without destroying the privilege." *Indep. Redist.*, 206 Ariz. at 142, ¶ 39, 75 P.3d at 1100. "The doctrine does not create a privilege, but is an exception to the rule that communications between a person and a lawyer representing another person are not privileged." *Id.* at ¶ 36, 75 P.3d at 1100. The exception applies to "legal, factual, or strategic" communications that "further the legal interests of each client." *Id.* at ¶ 39, 75 P.3d at 1100. *See also* A.R.S. § 12–2234 (protecting "any communication" made by the client to the attorney or the attorney's advice given to the client). *But see Granger v. Wisner*, 134 Ariz. 377, 379–80, 656 P.2d 1238, 1240–41 (1982) (finding no protection for "facts which are not part of the communication between lawyer and client," such as the fact that client consulted an attorney, the identity of the client, and the dates and number of visits).

¶ 31 As the Attorneys asserted below,[4] the identification of those who assented to or opposed the issuance of the subpoena would have conveyed more than conduct—it would have revealed communications and advice between client and attorney about active litigation, and reflected strategic decisions individual to each client. *See Indep. Redist.*, 206 Ariz. at 142, ¶ 39, 75 P.3d at 1100 (providing that the attorney-client privilege "applies to confidential communications made for the purpose of obtaining or providing legal assistance for the client"). The "conduct" of agreeing to the subpoena was therefore a privileged communication and the court was not free to order individual Attorneys to reveal who agreed to issue it.[5]

¶ 32 The Attorneys acted properly by asserting the privilege. When a trial court enters an order that potentially invades a privilege, lawyers are placed in a most difficult ethical position. The appropriate course for the court in such situations is to grant a request for a stay pending appellate review. Immediate resort to physical confinement of an attorney who makes a colorable claim of privilege does nothing to promote orderly enforcement of legal rights and serves only to chill lawyers' willingness to adhere to ethical obligations in difficult circumstances.

## III. THE COURT FAILED TO AFFORD THE ATTORNEYS DUE PROCESS.

### A. Sanctions

▆▆▆ ¶ 33 The trial court likened its inquiry to a "culprit hearing" to determine whether a lawyer or a party should be held responsible for a discovery violation. *See* Hon. Robert L. Gottsfield, *Holding a "Culprit" Hearing for Discovery Failures: Assessing Counsel Personally to Enforce the "Reasonable Litigator" Ethic*, 32 Ariz. Att'y 29 (July

1996). *See also Treadaway v. Meador*, 103 Ariz. 83, 84, 436 P.2d 902, 903 (1968) (allowing the trial court to determine whether a party or lawyer is responsible for a discovery violation). But when no single Attorney would "get up and deny" involvement in the decision to issue the subpoena, the court imposed sanctions on all the Attorneys.

▆▆▆ ¶ 34 The requirement that a court conduct a "culprit hearing" is aimed at protecting a party from dispositive sanctions when the fault lies only with counsel. Such hearings present an opportunity for the client to reveal to the court its lack of involvement in sanctionable conduct. *See, e.g., Rivers v. Solley*, 217 Ariz. 528, 530–31, ¶¶ 13–14, 177 P.3d 270, 272–73 (App.2008); *Zimmerman v. Shakman*, 204 Ariz. 231, 237, ¶¶ 20–23, 62 P.3d 976, 982 (App.2003). Though such a hearing may present attorney and client with thorny choices, the court is not automatically entitled in such hearings to compel disclosure of attorney-client communications—the decision whether to waive the privilege rests with the client.

¶ 35 Here, the circumstances did not call for a determination whether any client had been involved in the decision to issue the subpoena, and the court did not pursue that inquiry. And while it is conceivable in some cases that concerted misconduct by multiple lawyers might be pertinent in a sanctions hearing, the court provided no opportunity for the various clients to consider waiver of the protections afforded by the CIA because it provided no notice that it would inquire into privileged matters. Indeed, the court did not provide an opportunity for the Attorneys to confer with their clients before confining Sannes.

¶ 36 The conduct of the November 4 hearing is disconcerting for another reason—the

4. One Attorney objected to the court's question because the "base of the inquiry is what was your legal opinion about the subpoena?" We agree that this objection was meritorious.

5. The court also suggested that Attorneys subject to the CIA were required to notify the court that they had entered a CIA. Of course, disclosure of the agreement would be necessary to claim the protection it supplies, but we are unaware of any legal authority that requires parties to inform the

court whenever a CIA exists. To the contrary, such disclosure would reveal the attorneys' advice that common interests existed between their clients—communications that are protected under the attorney-client privilege. *See* A.R.S. § 12–2234; *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 217 (Tenn.Ct.App.2002) ("[T]he compelled disclosure of the existence of a joint defense agreement is an improper intrusion into the preparation of a litigant's case....").

court characterized it as an "order to show cause hearing" but actually conducted an *evidentiary* hearing without prior notice to the attorneys that they would be called upon to testify. *Cf. Zimmerman v. Shakman*, 204 Ariz. 231, 235, ¶ 13, 62 P.3d 976, 980 (App. 2003) (requiring that sanctions for disclosure violation "be preceded by due process"); *Ong Hing v. Thurston*, 101 Ariz. 92, 98–99, 416 P.2d 416, 422–23 (1966) (requiring due process protections in cases of indirect contempt).

¶ 37 "[T]he imposition of sanctions should be preceded by some form of notice and opportunity to be heard on the propriety of imposing the sanctions." *Precision Components*, 179 Ariz. at 555, 880 P.2d at 1101. "Whether an additional hearing on sanctions should be required . . . depends on . . . 1) the circumstances in general; 2) the type and severity of the sanctions under consideration; and 3) the judge's participation in the proceedings, knowledge of the facts, and need for further inquiry." *Id.* at 556–57, 880 P.2d at 1102–03. But, "[i]n all cases . . . the accused must be given an opportunity to respond, either orally or in writing, to justify his or her actions." *Id.* at 557, 880 P.2d at 1103.

¶ 38 During the November 1 status conference, the trial court announced its view that the subpoena was harassing and delay-inducing. It gave the Attorneys notice that they would have to show cause why sanctions should not be imposed later that week. This type of notice, however, was not effective to alert the Attorneys they would be placed under oath and ordered to give details about the Common Interest Agreement and communications protected by it. When the court rejected their assertion of privilege, the Attorneys requested leave to both fully brief the issue and seek special action relief. But the court summarily rejected those requests.[6]

¶ 39 In *Precision Components*, our supreme court explained that due process did not require a separate sanctions hearing when the trial court advises attorneys what form the sanctions will take, and when the court does "nothing to prevent appellant from moving for an additional hearing in order to present evidence to excuse or support its conduct." 179 Ariz. at 556, 880 P.2d at 1102. Here, the trial court was unable to concretely explain the abusive nature of the subpoena, and it deferred any discussion of the form of sanction by taking the question under advisement. Its conduct of the hearing—in rejecting requests to fully brief the privilege issue and handcuffing an attorney who requested special action relief—prevented the Attorneys from presenting evidence that could justify or excuse their conduct. On these facts, the court should have conducted a separate hearing to ensure that the parties were fully prepared to address the legal question at issue.

¶ 40 Finally, the imposition of sanctions constituted an abuse of discretion because the court could not describe *how* the subpoena was offensive. Instead the court stated that "some things just kind of jump out at you. You can't articulate the reasons for it." The court summarily rejected the Attorneys' contention that the records were necessary to test Dr. Willson's bias and methodology as misplaced "in this kind of case." The only specific support for the finding of harassment and delay the court provided was that the subpoena was issued before Dr. Willson completed Lund's examination. But as we stated above, discovery methods may be used in any sequence, Ariz. R. Civ. P. 26(d), and the matter of timing, without more, was no reason to impose sanctions. While the court has authority to impose sanctions for discovery violations, it

6. The colloquy reads:
> MR. SANNES: Are you saying that if I do not answer your question, you'll have a deputy of the Sheriff's Department come to the court to apprehend me and take me to jail this. [sic]
> THE COURT: I am. I'm going to hold you in direct civil contempt. And the purge clause is going to be you'll get out of jail when you answer my questions.

> MR. SEGAL: Your Honor, may we have an opportunity to obtain relief by special action?
> THE COURT: No. And Mr. Segal, if I want to hear from you, I'll ask you.
> MR. SEGAL: Your Honor, this is my client. I will make objections as appropriate. That is my right as an attorney.
> THE COURT: Your objection's overruled.

should first attempt to limit discovery that it considers overbroad through traditional application of the rules.

### B. *Contempt*

¶ 41 Our concern for the lack of due process also extends to the court's imposition of contempt sanctions. A finding of civil contempt requires that the contemnor (1) has knowledge of a lawful court order, (2) has the ability to comply and (3) fails to do so. *See generally Ong Hing*, 101 Ariz. 92, 416 P.2d 416; *State v. Cohen*, 15 Ariz.App. 436, 440, 489 P.2d 283, 287 (1971). In this case, we have held that the court's order compelling disclosure of communications within the scope of the CIA was not lawful. Accordingly, the finding of contempt based on noncompliance with that order was error. And from the trial court's perspective, it should have been apparent at a minimum that counsel's invocation of privilege created a substantial question worthy of review before a finding of contempt. Moreover, because the Attorneys faced ethical constraints on their ability to answer the court's questions, they lacked the immediate ability to comply with the court's order.

¶ 42 We recognize that "direct" contempt—that committed in the presence of the court—can be addressed in more summary fashion than indirect contempt. *Ong Hing*, 101 Ariz. at 99, 416 P.2d 416 at 423. But a court cannot circumvent the due process requirement of *Ong Hing* by manufacturing circumstances that make the directness of the contempt all but unavoidable. By failing to give the Attorneys advance notice of their intended status as witnesses, the expected subject matter of their testimony and the risk of immediate contempt sanctions, the court left them no meaningful choice but to decline compliance in its presence. By refusing the Attorneys' requests for additional briefing or the opportunity to seek immediate appellate review, the court effectively bootstrapped the *lack* of due process into a situation that only superficially resembled direct civil contempt. We conclude that the Attorneys' conduct presented no threat to "the administration of justice" so severe as to warrant the summary imposition of contempt sanctions. See *id.* at 98, 416 P.2d at 422.

### CONCLUSION

¶ 43 To be sure, there are times when an attorney may behave in a contumacious manner, flout a court order without cause or so denigrate the integrity of the court that immediate and drastic sanctions, including contempt, may be required. But when, as here, attorneys respectfully assert a legal position with which the court disagrees, the notion that they can properly be handcuffed in the courtroom undercuts the rules of procedure and ethos of the courts of this state. No attorney should fear that the assertion of privilege will result in the deprivation of his or her liberty until the full measure of due process has been afforded. The conduct of the court in this case represented a clear abuse of discretion, and we therefore grant relief and vacate the contempt finding against Sannes and all sanctions entered against the Attorneys.

CONCURRING: PATRICK IRVINE, Judge and MAURICE PORTLEY, Judge.