286 P.3d 789

**Bradford D. LUND, an individual; William S. Lund, and Sherry L. Lund, husband and wife, Petitioners,**

v.

**The Honorable Robert D. MYERS, Judge of the Superior Court of the State of Arizona, in and for the COUNTY OF MARICOPA, Respondent Judge,**

**Michelle A. Lund, Diane Disney Miller, Kristen Lund Olson, and Karen Lund Page, Real Parties in Interest,**

**Jennings Strouss & Salmon, P.L.C., Intervenor.**

**No. 1 CA–SA 12–0027.**

Court of Appeals of Arizona, Division 1, Department D.

Sept. 6, 2012.

---

Shumway Law Offices, LLC By Jeff A. Shumway and Jones, Skelton & Hochuli, P.L.C. By A. Melvin McDonald, Co–Counsel for Petitioner Bradford D. Lund.

Meyer Hendricks, PLLC By Ed Hendricks, Jr., Brendan A. Murphy, and W. Douglas Lowden, Phoenix, Attorneys for Petitioner William and Sherry Lund.

Burch & Cracchiolo, P.A. By Bryan F. Murphy, Daryl Manhart and Jessica Conaway, Phoenix, Attorneys for Real Parties in Interest Michelle Lund Diane Disney Miller, Kristen Lund Olson, and Karen Lund Page.

Jennings Strouss & Salmon, P.L.C. By John J. Egbert and J. Scott Rhodes, Phoenix, Attorneys for Intervenor.

BROWN, Judge.

¶1 Bradford D. Lund, and William and Sherry Lund (individually "Bradford," "William," and "Sherry"; collectively "the Lunds"), filed this special action seeking to prevent the superior court from conducting an *in camera* inspection of inadvertently disclosed documents, which they claim are sub-

ject to protection by the attorney-client privilege or work product doctrine.[1] The Lunds also argue that if an *in camera* inspection is warranted, it must not be conducted by the assigned trial judge. For the following reasons, we hold that the judge abused his discretion by ordering that the documents be submitted for *in camera* review without a threshold showing that the documents were subject to production. We also conclude that if *in camera* review of the documents is warranted, the review should not be conducted by the judge who will ultimately serve as the trier of fact.

## BACKGROUND

¶ 2 This litigation started in October 2009, when some of Bradford's relatives (the Real Parties in Interest in this special action; collectively referred to as "Miller") asked the superior court to appoint a guardian and conservator for Bradford based on his alleged incapacitation and inability to manage his financial affairs. *See Lund v. Donahoe*, 227 Ariz. 572, 576, ¶ 2, 261 P.3d 456, 460 (App.2011). Bradford, along with William and Sherry, opposed the request. *Id.*

¶ 3 On September 19, 2011, Bryan F. Murphy, an attorney with Burch & Cracchiolo ("B & C"), as counsel for Miller, served the law firm of Jennings, Strouss & Salmon ("JS & S")[2] with a subpoena *duces tecum*. The subpoena requested all "nonprivileged" documents relating to Bradford, including documents and communications relating to (1) durable general powers of attorney signed in April 2003 and February 2006; (2) a petition for appointment of co-guardians for Bradford filed in Maricopa County Cause No. PB2006–000478;[3] and (3) "any will, trust, or other testamentary document prepared for execution by Bradford[.]" The next day, T. Patrick Flood, an attorney with JS & S, responded to the subpoena by completing a declaration indicating that as the custodian of

records for the firm, he was attaching 239 pages of records, which constituted "a full and complete copy" of the JS & S file. The documents were then delivered to B· & C.

¶ 4 As Flood would explain in a subsequent declaration filed with the superior court, when he reviewed the JS & S file after receipt of the subpoena, he observed that the file related to work performed by fellow attorney Stewart Manley regarding withdrawal of a petition for appointment of co-guardians previously filed on behalf of Bradford by a different law firm. Manley no longer worked at JS & S, and Flood's review of the file also indicated the original JS & S file had been given to Bradford on March 31, 2010, apparently at the telephonic request of attorney Jeff A. Shumway. Because Manley had represented the "petitioner," and the subpoena from B & C stated that it was on behalf of "petitioners," Flood "erroneously assumed that [B & C] represented the same party or parties" that Manley had represented. Flood therefore thought there was no need to review the file for privileged documents. Flood then contacted Murphy and informed him that JS & S only had a copy of the file, to which Murphy voiced no concerns. According to Flood, nothing during that phone conversation alerted him that Murphy did not represent Bradford.

¶ 5 Flood explained further that on October 3, 2011, Shumway, representing Bradford, contacted JS & S to advise that a subpoena from B & C had been or would soon be served and that Shumway intended to object. The following day, Flood called Shumway and explained what had been done in responding to the subpoena, to which Shumway expressed "some concern." As noted by Flood, this was the first indication that he "might have been mistaken in [his] assumption that [B & C] represented some or all of the same parties that Mr. Manley had represented." Flood also stated he in-

---

1. Unless otherwise noted, for ease of reference we generally refer to the documents at issue as privileged, even though many are claimed to be subject to protection only under the work product doctrine.

2. On the court's own motion, it is ordered amending the caption to add JS & S as an

intervenor. JS & S's only involvement in this special action was its joinder in the Lunds' stay request.

3. This 2006 guardianship proceeding, which was initiated by Bradford, was later voluntarily dismissed.

formed Shumway that the original file had been provided to Bradford. Shumway responded that he did not recall requesting that the original be given to Bradford, but if Shumway could not find the file, he would come to JS & S to review the copy to determine whether any privileged documents had been disclosed. Flood noted further in his declaration that Shumway did not contact him again regarding the matter. Flood concluded that his disclosure of the entire file was made in good faith, and any disclosure of privileged communications or work product was "completely inadvertent."

¶ 6 Also on October 4, 2011, Shumway sent the following email to Murphy:

I just learned that [JS & S] forwarded you documents shortly after receipt of your subpoena. They did this without notice to Bradford and apparently without reviewing the files for attorney client privileged materials.

I do not have a copy of the file, but I do have an index of the documents contained in the file. Some of the documents produced are attorney client privileged. Specifically, the files contain a memo to the file dated March 20, 2006 and billing statements dated April 20, 2006 and May 24, 2006. All of these matters are attorney client privileged and should not have been produced by [JS & S]. Please return the originals of the above listed files to me. You should not keep copies of the attorney client materials.

I plan on reviewing the files at [JS & S]'s offices later this week. If I come upon other attorney client materials I will promptly inform you. In the meantime, thank you for your professionalism.

A few minutes later, Murphy responded, "I haven't studied the materials produced with an eye toward privilege issues and will await word from you about documents that were produced which you consider subject to privilege." Shumway then replied: "As a starting point I know I will consider the Billing Statements to be privileged. I will let you know about the memo and any other documents once I see the file." Nothing in the record before us reflects that any further communications occurred between any of the attorneys regarding the JS & S file until October 27, when Murphy distributed the entire file to all other counsel[4] in the case, as well as a court-appointed investigator, as part of Miller's second supplemental disclosure statement.

¶ 7 On November 14, the Lunds filed a motion to disqualify B & C, asserting that because B & C had "read, kept, and distributed" privileged materials, the only remedy to rectify the "breach of ethics and rules" would be disqualification. At the same time, attorneys representing various parties other than Miller exchanged emails with Murphy, urging him not to disclose any privileged materials to the superior court. Murphy, however, maintained that determining whether the documents "are in fact privileged and whether their production is prejudicial" would necessarily require review by the court and that he intended to file the documents under seal for *in camera* review.

¶ 8 The following day, JS & S moved to intervene in the litigation, asserting that B & C had failed to return the inadvertently disclosed documents "in the manner prescribed by applicable procedural and ethical rules." JS & S therefore sought intervention "for the limited purpose of filing a motion to compel [Miller and B & C] to comply with the rules applicable to inadvertent disclosures."

¶ 9 On November 16, the Lunds filed an emergency motion seeking to prevent Murphy from disclosing the JS & S documents to the court and requesting they be returned to JS & S. At a hearing the next day, the court effectively denied the motion, permitting Murphy to retain the file but directing him not to "replicate or convey the documents to anybody." The court also ordered JS & S to prepare a log identifying each document it considered privileged. JS & S complied with the request on December 9, 2011, submitting a log indicating that forty-eight documents

4. Murphy sent the materials to Sandra Slaton, who at that time represented William and Sherry Lund; James Bohm and Raymond Brown, California counsel for Bradford; Joel Sannes, counsel for Rachel and Robert Schemitsch and Sabrina Lovejoy; and Joseph Boyle, the guardian ad litem.

were subject to the attorney-client privilege or constituted work product. The court granted JS & S's motion to intervene on January 9, 2012.

¶ 10 By minute entry dated January 13, 2012, the court explained that Miller would be permitted an extension of time to file a response to the motion to disqualify B & C until ten days after the court's ruling on the Lunds' emergency motion to prevent Murphy from filing privileged materials. The court then noted that the subpoena served upon JS & S unequivocally requested all "non-privileged portions of any file" but that JS & S's sending of the entire file occurred because of "excusable oversight." Reasoning that it was obligated to "determine which of the documents in the file are subject to the attorney-client privilege and/or work product privilege(s)," the court directed JS & S to file "a detailed explanation of which of the documents are privileged and the legal basis for that determination. Each explanation shall be on a separate piece of paper attached just beneath the document(s) itself." The court further ordered that all counsel be provided a copy of the document and that counsel for the Lunds and Miller could respond by using the same filing procedure. The court would "then review the documents, counsels' positions[,] and rule on whether there is a privilege for each document."

¶ 11 On January 19, the Lunds filed an objection "to any *in camera* review of privileged documents" and alternatively requested that if such a review occurs, that it be conducted by a different judge. JS & S moved to extend the deadline for filing the privileged documents, which the court denied, noting it would rule on the Lunds' objection to *in camera* review before reviewing JS & S's submission. The court explained further that it wanted to "compress time" and have "all the explanations of privileges and responses ready for ruling." The court therefore ordered JS & S to file the specified documents on January 31. The Lunds promptly filed this petition for special action together with a request for stay of the superior court's orders.

## JURISDICTION

¶ 12 Without question, this litigation has been highly contentious. *See Lund*, 227 Ariz. at 575, ¶ 1, 261 P.3d at 459. Within the last two years, at least twelve petitions for special action in this case have been filed in this court. We have declined jurisdiction in many of these cases because we are reluctant to interfere with ongoing proceedings in the superior court, preferring to resolve any remaining disputes through the normal appellate process. Additionally, trial judges are in the best position to resolve discovery disputes. *See Jones v. Buchanan*, 177 Ariz. 410, 411, 868 P.2d 993, 994 (App.1993) ("Traditionally, this court is loath to become involved in a pretrial discovery dispute."); *see also* Ariz. Appellate Handbook, § 7.3.1 at 7–9 (Hon. Philip Hall and Pamela B. Peterson, eds. 5th ed., 2010) (recognizing the limited ability of appellate courts to make decisions on significant issues without a fully developed factual record). However, given the alleged nature of the inadvertently disclosed documents at issue here and the potential prejudice to Bradford's fundamental rights, we immediately granted the Lunds' stay request and accepted jurisdiction. *Lund*, 227 Ariz. at 578, ¶ 16, 261 P.3d at 462 (noting that special action relief is proper "when a party believes a trial court has ordered disclosure of material protected by a privilege or work product shield") (citation omitted). We also accepted jurisdiction to provide guidance to the superior court and the parties before any further dissemination or review of the documents at issue. Finally, we accepted jurisdiction because the petition presents significant questions of first impression and statewide importance. *Id.*

## DISCUSSION

¶ 13 The principal question before us is whether the trial judge abused his discretion in ordering JS & S to submit the privileged documents to him for an *in camera* review for the purpose of resolving the pending motion to disqualify B & C.[5] *See Green v.*

---

5. In the January 27, 2012 minute entry, *supra* ¶ 1·1, the trial judge stated he would rule on the

Lunds' objection to *in camera* review before reviewing the privileged documents. However,

*Nygaard,* 213 Ariz. 460, 462, ¶ 7, 143 P.3d 393, 395 (App.2006) (explaining that a trial court abuses its discretion when it commits an error of law in the process of reaching a discretionary conclusion). The Lunds argue that *in camera* review of the privileged documents is unwarranted because Miller has not disputed any of the claims of privilege asserted by JS & S. Specifically, the Lunds assert the trial judge should not inspect the documents unless Miller makes a threshold showing that the documents are not privileged. The Lunds argue further that if an *in camera* inspection is justified it should be conducted by a judicial officer other than the one who will ultimately serve as the finder of fact and decide the merits of the case.

¶ 14 Miller counters that "virtually none" of the JS & S documents are privileged, but even assuming some are, the trial judge cannot confirm their privileged nature without reviewing them. Additionally, Miller asserts that any privilege was waived because neither the Lunds nor JS & S took reasonable steps to prevent their disclosure or to rectify the error once it was discovered.[6]

### A. Waiver

¶ 15 We turn first to the waiver argument, because the *in camera* matters would be moot if the privilege no longer existed. The only authority Miller directs us to is Arizona Rule of Evidence 502(b), which addresses, among other things, waiver of the attorney-client privilege and work-product protection in the context of an inadvertent disclosure:

> When made in an Arizona proceeding, the disclosure does not operate as a waiver in an Arizona proceeding if:
>
> (1) the disclosure is inadvertent;
>
> (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and
>
> (3) the holder promptly took reasonable steps to rectify the error, including (if

applicable) following Arizona Rule of Civil Procedure 26.1(f)(2).

Applying Rule 502(b) here, we conclude as a matter of law that disclosure of the file by JS & S did not operate as a waiver.

¶ 16 Miller does not dispute that JS & S's disclosure of its file was inadvertent. Nor does Miller argue that Bradford, as the holder of the privilege, failed to take reasonable steps to *prevent* its disclosure. As to whether Bradford took reasonable steps to *rectify* the error, his attorney promptly contacted Murphy to alert him that JS & S had disclosed at least two potentially privileged documents. Although Shumway's emails suggested he would follow up with Murphy after further review of the file later that week, Murphy confirmed he would "await word" from Shumway about which documents he considered to be privileged. Instead, with no further attempt to clarify whether the file contained privileged documents, three weeks later Murphy made the baffling decision to disclose all the documents.

¶ 17 Undoubtedly, Shumway could have acted more swiftly in seeking to ensure that Murphy was further informed of the nature and scope of the documents he claimed were privileged. Similarly, once alerted to the possibility he had disclosed a client file without first conducting a proper review, Flood could have contacted B & C to request return of protected documents. But their failure to take a more aggressive approach in no way suggests that Bradford acted unreasonably and therefore waived his privilege. This is especially true in light of Murphy's affirmative obligation under Arizona Rule of Civil Procedure 26.1(f)(2) ("Claims of Privilege or Protection of Trial Preparation Materials"), at the very least, to hold the documents until the dispute was resolved:

> If a party contends that information subject to a claim of privilege or of protection as trial-preparation material has been inadvertently disclosed or produced in dis-

---

nothing in the judge's ruling suggests he would provide the Lunds a further opportunity to object if he denied their objection. In any event, Miller agrees that the trial judge decided "to make an *in camera* review of the subject documents."

**6.** Miller suggests that a separate issue exists as to whether the privilege has been waived based on information revealed by William relating to dismissal of the 2006 guardianship proceedings. That issue has not been addressed by the trial court and therefore is not properly before us.

covery, the party making the claim may notify any party that received the information of the claim and the basis for it. *After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has made and may not use or disclose the information until the claim is resolved.* A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The producing party must preserve the information until the claim is resolved.[7]

Ariz. R. Civ. P. 26.1(f)(2) (emphasis added). This provision, added to Rule 26.1 in 2008, was intended to place a "hold" on the use or dissemination of an inadvertently produced document claimed to be privileged until the court resolves the issue or the parties agree to an appropriate disposition. *See* Ariz. R. Civ. P. 26.1(f) State Bar Comm. Note; *see also* Ariz. State Bar Comm. on the Rules of Prof'l Conduct, Ethics Op. 01–04 (2001) ("By 'freezing' the receiving counsel's use of the information and by requiring opposing counsel to be notified of its receipt, the policy minimizes the harm arising from the information's disclosure[.]"). Furthermore, "[a] lawyer who receives a document and knows or reasonably should know that the document was inadvertently sent shall promptly notify the sender and preserve the status quo for a reasonable period of time in order to permit the sender to take protective measures." Ariz. R. Sup.Ct. 42, ER 4.4(b).

¶ 18 Based on the plain language of these provisions, even assuming Murphy was not reasonably alerted to the existence of privileged documents by reviewing the file, his obligations upon receipt of Shumway's email became quite obvious. Murphy was to (1) "promptly return, sequester, or destroy the specified information" and make no use or disclosure of the documents "until the claim [was] resolved;" (2) notify JS & S; and (3)

"preserve the status quo for a reasonable period of time[.]" Ariz. R. Civ. P. 26.1(f)(2); Ariz. R. Sup.Ct. 42, ER 4.4(b) and cmt. 2. These obligations were triggered automatically by Murphy's knowledge that a claimed inadvertent disclosure had occurred—neither Bradford nor JS & S were required to take additional measures to ensure that Murphy complied with the clear command of Rule 26.1. If Murphy was concerned about the delay, he could have contacted Shumway or Flood, or properly sought resolution by the trial court, subject to the constraints discussed below. But, he failed to pursue any of those alternatives. In these circumstances, there was no waiver of the privilege under Arizona Rule of Evidence 502(b). *See United States v. Zolin,* 809 F.2d 1411, 1417 (9th Cir.1987) (finding that secretary's delivery of tapes "under the mistaken impression they were blank" did not waive the attorney-client privilege because the disclosure was "sufficiently involuntary and inadvertent as to be inconsistent with a theory of waiver"), *aff'd in relevant part and vacated in part,* 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989).

## B. Conducting *In Camera* Review

¶ 19 Against this backdrop, the Lunds' motion for disqualification is currently pending in the superior court. To resolve the motion, the trial judge has ordered JS & S to submit its privilege log and the corresponding documents for *in camera* review. We express no opinion as to whether B & C should be disqualified from further representation in this case; however, we do find it necessary to address whether the judge has prematurely ordered *in camera* review.

¶ 20 According to Miller, the claims of privileged documents are substantially overstated. Though Miller has not provided any specific analysis in response to the claims asserted by JS & S in the privilege log, she asserts generally that half of the file contains publicly made filings[8] and the remainder is comprised of drafts of filings, billing state-

---

7. Arizona Rule of Civil Procedure 45(c)(5)(C)(ii), governing inadvertent disclosure of information made in response to a subpoena, contains language virtually identical to Rule 26.1(f)(2).

8. The privilege log states that several documents, including reports prepared by a court investigator and a physician, were sealed by court order.

ments, materials provided to JS & S by the Lunds' former counsel relating to Bradford's business entities and assets in 2005, an engagement letter between Bradford and his former counsel, notes of a conversation between Bradford and JS & S counsel, and notes of other conversations with parties "which at most might be subject to a work product claim."

¶ 21 We are not concerned here with the number of documents that are privileged. Nor need we decide whether any of the documents will ultimately be admitted as evidence at future hearings in this litigation. Instead, our task is to determine whether, when a trial judge who serves as the ultimate finder of fact in a case is confronted with a claim that privileged documents have been inadvertently disclosed, the receiving party may simply submit those documents for review by the judge under seal. The parties do not cite, nor has our research revealed, any court decision in any jurisdiction addressing this issue.

¶ 22 Arizona Rule of Evidence 501 provides that "[t]he common law—as interpreted by Arizona courts in the light of reason and experience—governs a claim of privilege unless any of the following provides otherwise: [1] the United States or Arizona Constitution; [2] an applicable statute; or [3] rules prescribed by the Supreme Court." We are unaware of any relevant constitutional provision or statute;[9] thus, we turn to procedural and ethical rules for guidance, considered in the context of principles derived from the common law.

¶ 23 We begin with the well-recognized principle that preserving confidentiality is one of the lawyer's most important obligations to his or her client. "A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the repre-

sentation or the disclosure is permitted or required by [ER 1.6](b), (c) or (d), or ER 3.3(a)(3)."[10] Ariz. R. Sup.Ct. 42, ER 1.6(a). Comment 2 to ER 1.6 further counsels:

> A fundamental principle in the client-lawyer relationship is that, in the absence of the client's informed consent, the lawyer must not reveal information relating to the representation.... This contributes to the trust that is the hallmark of the client-lawyer relationship. The public is better protected if full and open communication by the client is encouraged than if it is inhibited.

*Id.* at cmt. 2. Comment 3 to ER 1.6 explains that "[t]he principle of client-lawyer confidentiality is given effect by related bodies of law: the attorney-client privilege, the work product doctrine, and the rule of confidentiality established in professional ethics." *Id.* at cmt. 3.

¶ 24 Our case law similarly recognizes the importance of confidentiality and the central role the attorney-client privilege plays in client relationships and effective provision of legal services. *See, e.g., Samaritan Found. v. Goodfarb,* 176 Ariz. 497, 501, 862 P.2d 870, 874 (1993) ("The privilege is intended to encourage the client in need of legal advice to tell the lawyer the truth" and is therefore "central to the delivery of legal services in this country."); *Matter of Pappas,* 159 Ariz. 516, 522–23 n. 11, 768 P.2d 1161, 1167–68 (1988) (stating that the attorney-client privilege exists, in part, to "foster the public's confidence in the legal profession"); *Granger v. Wisner,* 134 Ariz. 377, 379, 656 P.2d 1238, 1240 (1982) ("The purpose of the attorney-client privilege is to encourage a client to confide in his or her attorney all the information necessary in order that the attorney may provide effective legal representation."). Our courts have also recognized the policy of protecting against " 'invading the privacy of

---

9. Our legislature has provided, in Arizona Revised Statutes ("A.R.S.") section 12–2234 (2003), that an attorney in a civil action cannot "be examined" as to client communications without the consent of the client, but the statute does not address document disclosure, much less inadvertent disclosure.

10. ER 1.6 provides one situation in which an attorney must reveal information related to the representation of a client and seven situations in which the attorney may do so. ER 3.3 outlines situations in which the attorney's duty of candor to the tribunal may require an attorney to disclose information to a court. None of these situations are relevant here.

an attorney's course of preparation' that is 'so essential to an orderly working of our system of legal procedure.'" *Longs Drug Stores v. Howe*, 134 Ariz. 424, 428, 657 P.2d 412, 416 (1983) (quoting *Hickman v. Taylor*, 329 U.S. 495, 512, 67 S.Ct. 385, 91 L.Ed. 451 (1947)); *see also Brown v. Superior Court*, 137 Ariz. 327, 334, 670 P.2d 725, 732 (1983) (noting purposes of protection afforded attorney's preparatory materials include maintaining the adversarial trial process and ensuring that attorneys are adequately prepared without fear that their efforts will be freely disclosed to opposing counsel).

¶ 25 As applicable here, Rule 26.1(f)(2), quoted *supra* ¶ 17, provides: "A receiving party may promptly present the information to the court under seal for a determination of the claim." [11] On its face, this provision appears to support the trial court's decision to order JS & S to submit the documents under seal. *See In re MH 2004–001987*, 211 Ariz. 255, 258, ¶ 15, 120 P.3d 210, 213 (App.2005) (noting that "[w]e interpret court rules according to the principles of statutory construction," starting "with the plain language of the rules"). Because the plain language of that sentence seemingly provides, with no limitation, that a receiving party can present the inadvertently disclosed information to the trial court under seal, then it follows that the court could order the sender, JS & S, to do the same. But such a broad interpretation of Rule 26.1(f)(2) would fail to give meaningful consideration to other language in the rule. *See Devenir Assocs. v. City of Phx.*, 169 Ariz. 500, 503, 821 P.2d 161, 164 (1991) (noting that we strive to give meaningful application to all of a rule's provisions).

¶ 26 When a document has been inadvertently disclosed and the receiving party is notified, that party must return, sequester, or destroy the document. Ariz. R. Civ. P. 26.1(f)(2). Further, the receiving party must not "use or disclose the information until the privilege claim is resolved." At the same time, the rule permits the receiving party to "promptly present the information to the

court under seal for a determination of the claim." *Id.* Doing so, however, would conflict with the other restrictions because (1) the receiving party would have failed to return, sequester, or destroy the document; and (2) the receiving party would have used the information before the claim was resolved. Bypassing these two restrictions would also run counter to Arizona Rule of Civil Procedure 26(g), which prohibits the trial court from considering or scheduling "[any] discovery motion" unless moving counsel has attached a statement showing good faith efforts to resolve the dispute.[12] *See Devenir*, 169 Ariz. at 503, 821 P.2d at 164 (explaining that courts construe rules in the context of other rules governing the same subject matter and strive to find consistency).

¶ 27 Accordingly, considering Rule 26.1(f)(2) in its entirety and in relation to Rule 26(g), together with the goal of preserving the confidentiality of attorney-client communications, we cannot construe the rule as granting the receiving party an unqualified right to file privileged information with the court. Instead, a party in receipt of such inadvertently disclosed information may properly obtain *in camera* review only after compliance with procedural rules and upon a factual showing that specific documents are likely not privileged or that the privilege has been waived. *See Zolin*, 491 U.S. at 572–73, 109 S.Ct. 2619.

¶ 28 In *Zolin*, the Internal Revenue Service (IRS) sought access to documentary materials that had been filed under seal with the Los Angeles Superior Court relating to a tax investigation of the founder of a church. 491 U.S. at 556–57, 109 S.Ct. 2619. The church asserted the attorney-client privilege as a bar to disclosure of two tapes included in the request. *Id.* at 557–58, 109 S.Ct. 2619. The IRS countered that the tapes fell within the crime-fraud exception to the attorney-client privilege and urged the trial court to listen to the tapes *in camera* before making a determination on privilege. *Id.* at 558, 109 S.Ct. 2619.

---

**11.** Neither party has provided any useful analysis as to the application of this rule. The Lunds briefly mentioned it in their petition, and Miller did not address it in her response.

**12.** Nothing in the record provided to us indicates that any party has complied with Rule 26(g) in connection with the various pleadings addressing the JS & S file.

¶ 29 Recognizing the tension between the policies underlying the attorney-client privilege and the orderly administration of justice, the United States Supreme Court stated, "[a] blanket rule allowing *in camera* review ... would place the policy of protecting open and legitimate disclosure between attorneys and clients at undue risk." *Id.* at 571, 109 S.Ct. 2619. The Court further explained:

> Our endorsement of the practice of testing proponents' privilege claims through *in camera* review of the allegedly privileged documents has not been without reservation. This Court noted in *United States v. Reynolds,* 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953), a case which presented a delicate question concerning the disclosure of military secrets, that 'examination of the evidence, even by the judge alone, in chambers might in some cases jeopardize the security which the privilege is meant to protect.' *Id.* at 10, 73 S.Ct. at 533. Analogizing to claims of Fifth Amendment privilege, it observed more generally: 'Too much judicial inquiry into the claim of privilege would force disclosure of the thing the privilege was meant to protect, while a complete abandonment of judicial control would lead to intolerable abuses.' *Id.* at 8, 73 S.Ct. at 532.

*Id.* at 570–71. The Court concluded that requiring a threshold showing before *in camera* review reaches a proper compromise, holding that before a "court may engage in *in camera* review at the request of the party opposing the privilege, that party must present evidence sufficient to support a reasonable belief that *in camera* review may yield evidence that establishes the [crime-fraud] exception's applicability." *Id.* at 574–75. The Court also held "that the threshold showing to obtain *in camera* review may be met by using any relevant evidence, lawfully obtained, that has not been adjudicated to be privileged." *Id.* at 575.

¶ 30 Miller attempts to distinguish *Zolin* and other crime-fraud exception cases, asserting the documents at issue in those cases were indisputably privileged unless the crime-fraud exception applied. But Miller has provided us with no authority stating that the standards for conducting an *in camera* review articulated in crime-fraud exception cases do not apply to privilege determinations where documents were inadvertently disclosed. If anything, the threshold showing necessary to trigger *in camera* review in a crime-fraud exception case should be lower than in an ordinary discovery dispute involving allegedly privileged materials. *Cf. Zolin,* 491 U.S. at 562, 109 S.Ct. 2619 (recognizing that the purpose of the crime-fraud exception is to assure that the "seal of secrecy" between lawyer and client does not extend to communications "made for the purpose of getting advice for the commission of a fraud" or crime). And while *Zolin* specifically involved the crime-fraud exception to the attorney-client privilege, the Ninth Circuit has recognized the applicability of *Zolin* in a different situation. *See In re Grand Jury Investigation,* 974 F.2d 1068, 1074–75 (9th Cir.1992) (applying two-stage process established in *Zolin* "when a party seeks *in camera* review to contest assertions of the [attorney-client] privilege"). In that case, the Ninth Circuit determined that the corporation's privilege log and accompanying affidavits were sufficient to establish that the attorney-client privilege applied to eleven documents it claimed were the product of seeking legal advice and that the government failed to provide an adequate factual showing to justify *in camera* review. *Id.* at 1075.

¶ 31 Similarly, the Colorado Supreme Court relied on *Zolin* in a case that did not involve the crime-fraud exception. *See State v. Madera,* 112 P.3d 688, 691–93 (Colo.2005). In *Madera,* the prosecution served a subpoena on Madera's former attorney seeking all documents relating to the representation and asserting that Madera impliedly waived the attorney-client privilege by seeking to withdraw his guilty plea on grounds of ineffective assistance of counsel. *Id.* at 689. The trial court denied Madera's motion to quash the subpoena, found Madera waived the attorney-client privilege, and ordered his former attorney to turn over the documents for *in camera* review. *Id.*

¶ 32 On appeal, the court found the order was premature, explaining that "[a] trial

court should be reluctant to review the contents of an attorney's case file precisely because of the importance of the privileges involved. *In camera* disclosure to the court is still a form of disclosure." *Id.* at 691. Relying in part on *Zolin*, the court articulated several factors a court should consider before granting a request for *in camera* inspection of an attorney's case file, including (1) whether the information sought is relevant to a matter at issue; (2) whether the information could be obtained by any other means; (3) whether the information is privileged; (4) if so, whether the privilege has been waived; and (5) if waived, the extent of the waiver. *Id.* The court also noted that before resorting to an *in camera* inspection, "the moving party must show that the other means of resolving the dispute have been exhausted and that the requested relief is narrowly tailored." *Id.* at 693.

¶ 33 Although *Madera* did not involve an inadvertent disclosure, its reasoning is nonetheless persuasive. If, as the case suggests, a trial court should be reluctant to review an attorney's file after compelled production, then a request for *in camera* review of inadvertently disclosed documents should be scrutinized even more skeptically. This is particularly true here, because Miller's counsel has already taken the inappropriate step of disclosing the documents to the other parties in the litigation. *Cf. Abamar Housing & Dev., Inc. v. Lisa Daly Lady Decor, Inc.,* 724 So.2d 572, 574 (Fla.Dist.Ct.App.1998) (recognizing that counsel gained an unfair tactical advantage through copying the documents); *Resolution Trust Corp. v. First of Am. Bank,* 868 F.Supp. 217, 220 (W.D.Mich.1994) ("While lawyers have an obligation to vigorously advocate the positions of their clients, this does not include the obligation to take advantage of a clerical mistake in opposing counsel's office where something so important as the attorney-client privilege is involved."). Submitting the documents to the ultimate factfinder for an *in camera* inspection, without a reasonable showing of the necessity of doing so, would only magnify this advantage. *See Zolin,* 491 U.S. at 571, 109 S.Ct. 2619 ("There is no reason to permit opponents of the privilege to engage in groundless fishing expeditions, with the dis-

trict courts as their unwitting (and perhaps unwilling) agents."). Thus, a party who has failed to maintain the status quo pending the outcome of a dispute over a claim that documents were inadvertently disclosed should not be rewarded with a "free look" by the trial judge without a reasonable showing that the documents are not entitled to protection from disclosure. *Cf. Madera,* 112 P.3d at 691 (noting that even if a court goes no further and declines to ultimately release any documents, "the court's review could have a chilling effect on attorneys and their clients, especially if *in camera* review occurred frequently or was easily obtained.").

¶ 34 Suggesting that the trial judge would abuse his discretion by making privilege determinations without an *in camera* review, Miller directs us to *Samaritan Health Servs., Inc. v. Superior Court,* 142 Ariz. 435, 690 P.2d 154 (App.1984) and *State ex rel. Babbitt v. Arnold,* 26 Ariz.App. 333, 548 P.2d 426 (1976). In *Samaritan,* we concluded that the trial court was required to conduct an *in camera* review to determine whether portions of witness interview summaries used to refresh recollections should be excised before making them available to the opposing party. 142 Ariz. at 438, 690 P.2d at 157. In *Arnold,* we concluded the trial court acted arbitrarily in ordering that a document whose contents had been divulged to the Attorney General, as legal advisor to the county, be produced without first ascertaining whether the privilege actually applied. 26 Ariz.App. at 335–36, 548 P.2d at 428–29. Neither *Samaritan* nor *Arnold* provides relevant guidance here. Both cases were decided well in advance of *Zolin,* and before either Rule 26.1(f)(2) or ER 4.4(b) was adopted. Neither case therefore addressed whether any type of showing is necessary to trigger *in camera* review. Additionally, neither case involved the inadvertent disclosure of privileged documents, or, more precisely, the situation in which inadvertently disclosed documents were intentionally disseminated to other parties in the face of a request that at least some of the documents were claimed to be privileged.

¶ 35 In sum, we conclude that Miller has thus far failed to present information to support a reasonable belief that *in camera* re-

view may yield evidence establishing the documents are not privileged. If she is able to articulate reasonable grounds, supported by independent information not acquired from her counsel's improper review of the documents themselves, why any of the documents listed in the privilege log are not subject to the attorney-client privilege or work-product protection, an appropriate course of action would be to conduct an *in camera* review of those particular documents. For example, if Miller could produce reliable information that the documents the Lunds claim were filed under seal in the earlier conservatorship proceeding were in fact publicly disclosed with the permission of Bradford or his counsel, the threshold showing would presumably be satisfied as to those documents. But as to other items included on the privilege log, such as the JS & S attorney notes reflecting a conversation with Bradford or the narrative descriptions included in the billing statements, we are hard pressed to think of any information Miller could produce to justify *in camera* review. *See Madera*, 112 P.3d at 690 (stating that before conducting *in camera* review of an attorney's file, "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the attorney-client privilege does not protect all of the documents in the file" (internal quotations and citation omitted)).

### C. *In Camera* Review by the Trier of Fact

¶ 36 The Lunds also argue that if Miller is able to meet the necessary threshold, any *in camera* review should be conducted by someone other than the assigned trial judge to avoid tainting the trier of fact. We agree.

¶ 37 Under the conservatorship statute, the superior court is tasked with making all necessary factual findings and orders regarding the potential appointment of a conservator. *See* A.R.S. § 14–5401(A) (Supp.2011). The current judge has been significantly involved in these proceedings. A different judge has been appointed to serve as a special master to handle discovery matters. In this case, with two judges already involved in different roles, it would make little sense to have the trial judge review documents from the JS & S file and run the risk of tainting the ultimate outcome on the merits if it turns out that some of those documents are privileged and contain information prejudicial to Bradford. At that point it would simply be impossible for the trial judge to "unring the bell." [13]

¶ 38 We therefore conclude that under the unique circumstances presented in these proceedings, the prudent course of action for the superior court is to have a different judicial officer, such as the special master already appointed, conduct an *in camera* review should it become necessary to do so.[14] *See Zolin*, 491 U.S. at 571, 109 S.Ct. 2619 (noting that "examination of [privileged] evidence, even by the judge alone, in chambers might in some cases jeopardize the security which the privilege is meant to protect") (citation and internal quotations omitted); *In re Marriage of Decker*, 153 Ill.2d 298, 180 Ill.Dec. 17, 606 N.E.2d 1094, 1107 (1992) (recommending that if the trier of fact is called upon to resolve a privilege claim and will later rule on an issue that the privileged information may affect, another judge should conduct an *in camera* inspection once the initial threshold has been met and the court determines an *in camera* review is proper); *In re St. Johnsbury Trucking Co., Inc.*, 184 B.R. 446,

---

13. We recognize that trial judges routinely evaluate the admissibility of evidence and exclude inadmissible evidence from their consideration. There is a critical difference, however, between evidence that is merely inadmissible, and information that is privileged from disclosure. This distinction would be meaningless if the finder of fact were to review information claimed to be privileged at the behest of the party seeking its dissemination.

14. Our concern that a judge who will serve as the trier of fact may become too closely involved in trying to resolve privilege claims should not be construed to apply to situations when the risk of prejudice to the client is minimal. For example, when an attorney requests *in camera* review of information with consent of the client, such as billing statements filed in support of an application for attorney's fees or other administrative-related matters, the judge would have broad discretion in handling the request.

455 n. 17 (Bankr.D.Vt.1995) (noting it would be inappropriate for the court, as the ultimate decision maker in a sanctions proceeding, to review privileged materials and that *in camera* review would be assigned to a different judge).

## CONCLUSION

¶ 39 For the foregoing reasons, we vacate the superior court's order directing JS & S to provide documents from its inadvertently disclosed file for *in camera* review. If Miller is able to establish the requisite showing for *in camera* inspection of the documents, the superior court shall ensure such review is not carried out by the judge who will ultimately serve as the trier of fact.

CONCURRING: PETER B. SWANN, Presiding Judge, and JON W. THOMPSON, Judge.